Hon. FÉLIX P. POCHÉ,
Hon. ROBERT B. TODD,
Hon. CHARLES E. FENNER, } *Associate Justices.*
Hon. THOMAS C. MANNING,

---

### No. 8613.

### F. W. TILTON ET AL. VS. THE NEW ORLEANS CITY RAILROAD COMPANY.

The property known and designated as the "*commons*," acquired by the treaty of cession of Louisiana, was donated in 1807, by the United States to the City of New Orleans, on two conditions: 1st, that a reserve would be made of a strip through it, to enable the N. O. Navigation Co. to connect its canal and basin with the river; and, 2d, that the same would forever remain open as a public highway.

The sale by the City in 1809 of lots fronting the space selected for the purpose and known generally as the "*neutral 'ground,*" was made in reference to the dedication, as shown on the plan drawn up at the time, from which it appears that the space was described as "*Rue et Promenade.*"

The right of the Naivgation Company was subsequently acquired by the City.

The destination of the strip of ground, was not changed by the City. If it was altered, the City had the right to do so, derived from the Code, the Statute and her charter.

The City has authority to grant a right of way through her streets and other property.

The City first granted the privilege of way to the New Orleans City Railroad Company in 1876, but subsequently recalled it, and again in 1881 conferred it anew.

The ordinances concede the right of laying tracks from Basin to Carondelet, but not that of using *steam* as a propeller.

The plaintiffs were owners at the time the tracks were laid and did not object thereto.    Their silence is an acquiescence.

The right to use steam not having been granted, the Company has no authority to run and station their trains, moved by that power, as they do, between the designated points.

The use of steam is therefore a nuisance, if not actual, at least constructive.

The injunction asked cannot issue to prevent the defendant Company from using the tracks, but only to prohibit the use of steam, between the two streets named.

APPEAL from the Civil District Court, for the Parish of Orleans. *Houston*, J.

### *Breaux & Hall* for Plaintiffs and Appellants:

1.  The neutral ground on Canal street, occupied by defendant, was dedicated as a promenade. Plaintiffs having acquired their property with reference to such dedication, had vested rights to the same, of which they could not be deprived by the vendor corporation.    Act of Congress, 1807, March 3d, U. S. at large, p. 441; Act of Deposit by Macarty, Mayor, Rec. p. 181, Map; French vs. N. O. and Carrollton R. R. Co., 2 An. 87; Sarpy vs. Municipality No. 2, 9 An. 598; Municipality No. 2 vs. Orleans Cotton Press, 18 L 237; Cincinnati vs. The Lessee of White, 6 Peters 431; Delabigarre vs. Municipality No. 2, 9 An. 233; New Orleans vs. United States, 10 Peters, 710.

2.  No particular form or ceremony is necessary in the dedication of land; and the subsequent acquisition of title to property dedicated to public use, by the donee, enures to the benefit of the dedication.    New Orleans vs. United States, 10 Peters, 713; Sarpy vs. Municipality, No. 2, 9 An. 597; Delabigarre vs. Same, 3 An. 233.

3.  The sovereign alone has the right to change the destination of public places.    New Orleans vs. United States, 10 Peters, 713; Parish vs. Municipality, 8 An. 149.    Even this is denied by Judge Martin in DeArmas vs. Major & Co., 5 L. 158.

4.  That which, from being pursued under authority of the law, cannot be a public nuisance, may be a private nuisance.    Wood on Nuisances, p. 788, Sec. 751; p. 796 (note); Dillon on Corporations, § 521.

5.  When the complaint shows that he suffers special and peculiar injury from a nuisance, he is entitled to an injunction.    High on Injunctions, § 755, note 4; Wood on Nuisances, p. 835, Sec. 783.

6.  The defendant is operating a road with steam trains, on Canal street, without legal right.

(a)  Granting the administration of franchises, and selecting the hands into which they shall be put, is a State prerogative; and it can be transferred only with the assent of the State, and in the mode pointed out.    N. O. Spanish Fort R. R. Co. vs. Delamore, opinion book, p.    ; Thomas vs. Railroad Company, 101 U. S. 83; The N. Y. & Maryland Co. vs. Williams, 17 Howard 30.

(b)  Neither the act incorporating the New Orleans, Metairie and Lake Company, nor the act of 1874, authorizing business and manufacturing corporations or companies, warrant the consolidation invoked.    Acts. of 1869, p. 205; Act of 1874, p. 18; bound Acts 1875.

(c)  The City Charter only grants power to regulate the running of steam trains.    Acts of 1870, par 11, Sec. 9.

7.  The purposes, objects and character of a corporation to run city railroad cars for passengers, is essentially different from those of an ordinary railroad to carry freight and passengers.

The one exercises privileges under a license by the City; the other exercises a franchise which can be granted only by the State.    Brown vs. Duplessis, 14 An. 892; Pierce on Railroads, pp. 246-7; New Orleans, Spanish Fort R. R. Co. vs. Delamore, opinion book, p.

8.  The unauthorized extension by a railroad of its track, is the attempted exercise of a valuable franchise, and is, of itself, sufficient ground for perpetuation of an injunction. High on Injunctions, Sections 412, 415, 408; 10 Miss. 82; 45 Barbour, 63; 27 N. Y. 611.

9.  When a company lays its rail on a street without statute authority, it may be enjoined by lot owners specially injured.  Dillon on Corporations, § 561 ; Railroad Company vs. Shields, 33 Ga. 601.

### *Braughn, Buck & Dinkelspiel* for Defendants and Appellees :

The United States having, by Act of Congress of March, 1807, granted and donated to the City of New Orleans all the property known and designated as the " Commons," acquired by the treaty and cession of the Province of Louisiana, the City of New Orleans was at liberty to dispose of the same, as in the judgment of her municipal authorities it might be for the best.  The grant of Congress was, however, coupled with one condition, viz : That the City of New Orleans was to reserve a strip or portion of land sufficient for a canal through a portion of the said ceded " Commons," to enable the N. O. Navigation Company to connect its canal and basin (at present the Old Basin and Canal Carondelet) with the Mississippi River.  The Navigation Company, in pursuance of the provision and reservation specially made in its interest, and embraced in the third section of the Act of Congress of March, 1807, selected the space at present known as the Neutral Ground on Canal street between South and North Canal streets.

The City of New Orleans took no action and made no disposition of the " ceded Commons," which embraced a wide space of ground all around the limits or boundaries of the City as it then existed, until the year 1809.  The Commons at the upper limit of the City extended from Customhouse street to the line of present Common street.

In 1809, under the administration of Mayor John T. Mather, the Council of the City determined upon a survey and subdivision of the entire Commons into blocks and lots, and on a sale of the same on ground rent titles, for a period of 39 years, and an ordinance to carry out this plan was passed.

The city surveyor, under this ordinance, at once proceeded to a survey and subdivision of the Commons.  The sale of lots within these Commons commenced the following year, viz : in 1810, the lots numbering from 1 to 459 by plan of " Tanesse, surveyor."  The first lot sold, or Lot No. 1, formed the corner of Dorsière and present North Canal street, the site of Stauffer, Macready & Co.'s hardware establishment.  The acts of sale of this and other lots, now fronting on North and South Canal, describe the lots, when on the lower side, as fronting on a projected road *(chemin projeté mesurant)* or measuring — feet in width, up to the lower line of the space of 42 feet, French measure, reserved for the Navigation Company, and when said lots were on the upper side, at present South Canal street, they are described in the acts of sale, all passed before Pedesclaux, notary, as measuring — feet front on a projected road (chemin projet) measuring — feet in width. and extending to the upper limit or line of "the reservation " between the two projected roads, for the Navigation Company.

In none of the acts of sale which conform in description with Tanesse's plan, are the lots described as fronting on a public promenade or on Canal street.  What has since been named on some maps, made many years later, as Promenade or Neutral Place, appears in none of the original titles when the property was sold in 1810, 1811, 1812, 1813, 1814, 1815, and so on, strictly according to Tanesse's plan, which was the official plan, determining measurement and all other rights.  The term Street or *Rue* as applied to present Canal street, appears neither on the plan or in the act of sale; *or* by *chemin projeté*.  In point of fact the Canal street of that period, was a road way along the Gravier Canal, into the Faubourg St. Mary, on the extension of Poydras street, and was laid out as early as the year 1795, and is at present the site of North Poydras street.  This is the " Old Canal street," referred to by Justice Rost in the case of " French vs. Carrollton Railroad."  The Navigation Company, at some period in the past, had acquired the Gravier Canal and had proposed also to connect the Old Basin with this Gravier Canal and a New Basin in the St. Mary Faubourg.  This was long before the Canal and Banking Company undertook the excavations of New Canal and New Basin.

Tilton et al. vs. Railroad Company.

The name of Canal street to the wide avenue which now bears the name, is of later date.

It may be well to know that the present middle space was held by the Navigation Company until the year 1842, as its own and private property.

By Tanesse's plan of 1809, it is not set apart as a public dedication; it is not designated as a promenade, nor is it so indicated or designated in the conveyances of the lots; but, on the contrary, it is especially designated as a "reservation" between two projected roadways, for the Navigation Company.

---

The opinion of the Court was delivered by

BERMUDEZ, C. J.  This is an injunction suit coupled with a prayer for damages, to prevent the defendant Company from running and stationing their steam cars and trains in front of the residences and stores of plaintiffs, on Canal street in this City, between Rampart street and Bourbon and Carondelet streets, the last two meeting and intersecting the first named street.

The grounds upon which the injunction is claimed are: that the strip of ground, on which the cars run and station, in the centre of the space between the buildings, fronting on each external line of the double street, and commonly known as the "*neutral ground*," was dedicated by the City to public use as a street and promenade; that the plaintiffs, having acquired their property from the City with reference to such dedication, have a vested right therein and cannot be divested thereof by the City; that the defendants are thus operating their trains without legal authority; that the use to which said strip of land was and is thus devoted, is an intolerable nuisance, greatly prejudicial to the plaintiffs in their persons, and detrimental to the value of their property; that they, the plaintiffs, are entitled to have such nuisance abated and to claim damages for the injury sustained.  The petition concludes with a prayer that an injunction issue and be perpetuated, and that the plaintiffs recover forty-five thousand dollars damages, to accrue to them in different proportions.

After a hearing on the face of the papers, an injunction was allowed, which was subsequently dissolved on bond.

The answers contain a denegation of the pretensions and charges preferred, particularly of a want of authority to the right of way and of running the steam cars, on the strip of land in question, and of the truth of the complaint that the exercise of such privilege has resulted into an intolerable nuisance.  The defendants further plead, that the plaintiffs are not entitled to an injunction, and that their money claim is barred by prescription.

From a judgment dissolving the injunction and rejecting their demand, the plaintiffs have appealed.

134

The fact that the defendants run and station steam cars and trains, as charged in the petition, is not disputed. The right of the plaintiffs to complain, if the running and stationing are unauthorized, and if the same are an intolerable nuisance, cannot be questioned.

The parties litigant have raised, argued and submitted many issues, only two of which we think should be determined, to set their differences at rest. They are:

1. Have the defendants legal authority to run and station their cars as they do?

2. If they have such authority, is the exercise by the use of steam of the right thus acquired a nuisance which should be abated?

### I.

The record shows that, on the 22d of August, 1876, by Ordinance 3617 A. S., the City Council gave a permission, revocable at pleasure, to the Company to run their cars between Basin and Carondelet streets; that, on the 15th of June, 1830, this permission was recalled by Ordinance 6528. It was renewed on the 3d of March, 1881, by Ordinance 6891, at the request of a large number of citizens styling themselves property holders and residents on Canal street, and authority given the Company to extend its track from Basin to Carondelet streets.

The municipal authority to thus use the neutral ground is so clearly given, that, but for the denial of the power of the council to make the concession, the first question would be of easy solution.

The plaintiffs contend, first, that the City had no right to grant the privilege of way; because:

A. The strip of land on which the cars are run and station, was dedicated to special public use; because

B. The City has no right to change the destination of a public place thus consecrated.

It appears that the United States having acquired, by the treaty of cession of Louisiana, the property known and designated as the " *commons*," donated the same in 1807 to the City of New Orleans, with the conditions: that a reserve would be made of a strip through a portion of the same, sufficient for a canal, to enable the New Orleans Navigation Co. to connect its canal and basin with the river, and that the same would forever remain open as a *public highway*. The space in question measuring 42 feet, French measure, was that selected for the purpose.

In 1809, the City authorities caused the commons to be divided into blocks and lots. Many were sold for ground rents. The titles describe them as fronting on a projected road up to the line reserved, upper or lower, for the Navigation Company.

In 1809, twenty-seven lots remaining unsold on Canal street, a plan was made of the same by the then City Surveyor, Pilié, which, by resolution of the Council, was to serve as a guide for the ordered sale. That plan shows that the space between the blocks on the upper and lower sides of Canal street, was thereon designated as "RUE ET PRO-MENADE DU CANAL." The lots of two of the plaintiffs figure on that plan.

In 1838, an attempt being made to excavate a canal on that middle space, it was arrested by the populace, who thought that the excavation would affect the public health, and the excavated spots were filled.

In 1842, the rights of the Navigation Company to the neutral ground were seized, offered for sale and adjudicated to the City of New Orleans.

In 1847, in the case of French vs. N. O., C. R. R. Co., 2 An. 87, passing allusion was made to old Canal street by this Court, and it was there said : " That street was laid out as a single street, and the proprietors, on both sides, purchased their lots with reference to that destination. The authority given to the Company to extend their canal through the middle of it was a change of destination of public property, not a divestiture of private ownership."

There can be no doubt that, from the beginning, the whole of the space was dedicated to public use. A strip, in front of the blocks, on each side, at first, 11 feet, presently, 18 feet wide, was devoted as sidewalks ; then, two other contiguous strips of a certain width were laid out and used as streets, leaving between them the strip, forty feet wide, known as the " *neutral ground*," upon which the steam trains of the defendant Company and the horse cars of several other companies are run and station.

That dedication was, therefore, originally for the purpose of a contemplated canal and side streets, and subsequently, for " a street and promenade."

The question which next presents itself is, whether that dedication has been changed by the City, and if so, whether the City had the right to do so, and whether the plaintiffs can be heard to complain.

The evidence does not show that the neutral ground in question has absolutely ceased to be a " *promenade.*"

The word is used without any limit, and means, as well, *promenade à pied, à cheval,* as *en voiture,* or any other, subject to municipal regulations.

The well known " Promenade des Champs Elysées," in the great French metropolis, is used for all three purposes.

The strip of land in question is not enclosed, either on its sides, or at

its intersections, by the several streets.    Citizens are free to walk across or along it, at their discretion or option.   It, therefore, remains accessible at all points.

.The evidence does  not show that it ever was used exclusively, if at all, as a pathway, or *promenade à pied*.   It appears that, for a long while, it served as a place of deposit for.rubbish, building materials and other purposes, which obstructed its use.

, Far from establishing that the City has changed its destination, by destroying or affecting its *public* character and converting it to *private* conveniences, the proof is, that the City has, by her administrators, employed this common property for the greater good of the whole community.   R. C. C. 458.

The City, it is of public notoriety, has, for upwards of twenty years, expressly permitted .the use of this neutral ground for street car purposes, for the greater benefit and advantage of citizens travelling in different directions, not only .without a murmur from anyone, but to the entire satisfaction of all.

:·The City had authority to do so.   It is well settled, by law and precedents, that the City has a supervision and control over all streets *public places and other public property* within her limits, and may regulate the use thereof.

. In 1859 the question was presented to this Court, whether the City had the power to sell.the right of way for the establishment of a railroad, through its streets.   It was determined in the affirmative, in a well considered and elaborate opinion, which was since followed : Brown vs. Duplessis, 14 An. 842 ; Board vs. City, 32 An. 915.

-. In the late case of Harrison, 34 An. 462, the present Court had occasion· to review a similar or identical question.   Supported by many authorities, from which copious extracts are embodied in the opinion, the Court held, that the doctrine is well settled that the legislature can delegate to a municipal corporation the power of authorizing the construction of a railway on a street of the city, as effectually as if the power and right had been conferred directly by the State herself. Dillon, Municipal Coporations, 556, 655 ; 27 Penn. Stat. 339 ; 33 Penn. Stat. 99 ; 6 Wheat. 328 ; 7 Barb. 509 ; 23 Peck. 328 ; 1 Barn. & Ad. 30 ; 18 Barb. 97 ; 12 Iowa, 246 ; 24 Iowa, 455 ; 10 Bush. 288 ; 87 Pa. 282 ; 3 Camp. 226 ; 5 Hill N. Y. 209.

..ñIn 1876, when the first ordinance was  passed granting permission to the defendant Company to build a track and to establish a stand for the lake·cars on Canal street, between Baronne and Carondelet streets, the City had the right to make the concession.   Her authority for so

doing was: the provisions of the Code, the Statute Book and her Charter.

The Codal provisions are : That common property is that, to the use of which all the inhabitants of a city or other place, or even strangers, are entitled in common, such as streets, public walks, the quays, and that common property, though it belongs to the corporation and be not for the common use, may be employed for their advantage by the municipal administrators. R. C. C. 458.

The statutary provision is, that "no railroad, plank road, or canal, shall be constructed through the streets of any incorporated city or town, without the consent of the Municipal Council thereof." R. S. 689.

The Charter, Secs. 12 and 13, provide that the City Council shall have the power to regulate and make improvements to the streets, public squares, and *other public property*, and to regulate the proper government of carts, drays, carriages, omnibuses, and all other vehicles of every description, freight, *locomotive*, passenger and street cars, which run in the streets and within the limits of the city.

This power was, perhaps, better formulated in the present charter, (1882, p. 21) which provides that the City shall have power to authorize the use of the streets for horse and steam railroads. The City owned the middle ground, either as public or private property, and in either contingency could have disposed of it, the way she did.

Strenuous efforts were made in argument to establish that the consolidation of the New Orleans, Metairie & Lake R. R. Co., (incorporated by law) with the defendant Company, was illegal, and that thereby the latter did not acquire the right said to have been possessed by the former to run and station steam trains on the spot in question. It is unnecessary, presently, to examine whether the first corporation ever existed and what its prerogatives were. It is likewise needless to ascertain whether the consolidation of the two companies was legal or not.

The City does not grant franchises. This can be done by the State alone. But the City can concede the right of way through her streets, public places and other property. It is perfectly true that franchises cannot be transferred.

It is worthy of note, also, that the titles of two of the plaintiffs date back to 1849 and to 1853, before any track was laid on the neutral ground in question, while that of the third one, which was to be produced, was not furnished, and is not included in the transcript.

The plaintiffs, then, were front property owners when the City permitted the use of the neutral ground the way she did, for street car purposes, whether moving or stationing.

If it be true that the plaintiffs had vested rights under their purchases in and to the strip of land on which the cars are run and stand in front of their residences and stores, they should have been as watchful as if the same had been their exclusive property. They have slept on the same, and at this late hour how can they be heard successfully to complain ?

The authorities are unanimous to the effect that, where a party stands by and silently permits the construction of a railroad on his land, it is too late for him, after the road is completed and large sums of money are expended on the faith of his apparent acquiescence, to seek, by injunction or otherwise, to deny to the railroad company the right to use the property.

The omission of resistance is an implied assent. The moment the work was completed without opposition, the public, the company, and all concerned in it, acquired á vested right to it.   Hilliard on Inj., 43 ; High on Inj., 397, and cases cited ; also, Goodin vs. Cin., 18 Ohio Stat., 16 9 ; 31 An. 480.

In the instant case, permission was first granted in 1876, and it has been enjoyed for four consecutive years without any judicial complaint on the part of plaintiffs. The privilege or right of way was next revoked, but after a brief interruption, again conceded.

In neither instances, however, was the right of using *steam* as a propeller, conferred. This is a most material omission, fatal to the pretensions of the defendants to run and station their trains moved by that power. This privilege should have been expressly formulated. It is hardly necessary that the defendant Company could not, and did not, acquire the right to use steam, by any concession on the part of the New Orleans, Metairie & Lake R. R. Co. Such right could not be delegated, either specially  or by an unauthorized consolidation of companies.

## II.

The plaintiffs complain that the cars run daily and continuously in the night, at short intervals; that this causes noises and motions which disturb the comfortable enjoyment and affect the value of their property ; that the engines emit odors, noxious vapors, which are exceedingly disagreeable to the senses, and that the use of the street or middle ground by said Company, in that manner, has become an intolerable nuisance which should be abated, and which has occasioned them damages, which they are entitled to recover.

Having reached the conclusion that, although the defendant Company was allowed by the City to extend its track to Carondelet street on the middle ground, still the City has not conferred on them the privilege

to run their trains, moved by *steam*, thereon; the legal consequence flowing therefrom is, that the unauthorized use of steam is a nuisance in contemplation of law, though perhaps not so in reality, of which the plaintiffs have a right to complain.

The right of way is, in terms, revocable, at the pleasure of the Council. The power of recalling or regulating it is in them. There can be no doubt that it will be exercised whenever they will deem it expedient to do so, in case a suppression be considered conducive to the public good.

From all the foregoing it results that, while the strip of land, known as the neutral ground, on Canal street was dedicated for a public use, its destination was not changed by the City; that, if it was altered, or modified to some extent, the change was accomplished with legal authority; that the plaintiffs, in any contingency, have no standing in Court to complain that the right of way and station was granted and the road laid; that the use of *steam*, on the space between Basin and Carondelet streets, being unauthorized, is a constructive nuisance, and that, as the Company has no authority to use steam, an injunction lies in the premises against it.

The evidence does not disclose a state of facts in which pecuniary damages can be allowed.

It is, therefore, ordered and decreed that the judgment appealed from be reversed; and it is now ordered, adjudged and decreed that there be judgment in favor of the plaintiffs, so far only as to allow the injunction prayed for, forbidding the defendant Company from using steam as a propeller on their tracks, between Basin and Carondelet streets, on Canal street in this City, and that, in other respects, the demand of plaintiffs be rejected, the defendants to pay costs in both Courts.

Fenner, J., recuses himself, having been of counsel.

Manning, J., concurs in the decree.

---

## CONCURRING OPINION.

MANNING, J. I concur in the decree, but I go further than the opinion of the Court seems to warrant, and there are parts of it to which I do not assent.

That steam trains on that part of Canal street are a nuisance, offensive to eye, ear, and smell, disagreeable at all times, and intolerable in our climate for one-half of the year, should seem scarcely questionable. We are told the purest oil is used on the running gear and that it emits no smell; that anthracite coal is burned that gives a whitish

smoke perceptible only in early morning; that no whistles are blown, and bells only tapped. If, with all these precautions, the air is laden often with stench and smoke, and the clatter drowns all fainter sounds, what would be the lamentable condition of these plaintiffs if full rein were given to the steam train to expend all its capacity for annoyance. The evidence of the kind and extent of the nuisance produced by these trains is ample, but if it were less complete, how can anyone shut out from sight and hearing the rattling of cars over iron rails, the puffing of laboring engines, the bell taps that announce the going out and coming in of a long line of carriages every fifteen minutes of some days, noises which are prolonged into the night and until the small hours of the morning.

And what is the excuse for inflicting this perpetual nuisance upon the inhabitants of the very heart of the city ? The promotion of trade and health ! The promotion of trade by a pleasure train that has no freight, and the promotion of health by putting the terminus only three blocks away from its present situs. One hundred and seven firms and individuals sign a petition to the city council to continue this nuisance, a large number of them between the terminus and the river and therefore unaffected by it, and sign it with the same indifference and facility that they would sign a petition for the pardon of a criminal, or for the execution of a saint, and these assert the great advantages derived from running these dangerous trains exceed the trifling inconveniences resulting from them. The comfort, freedom from stench and noise, of home life, and the safety of pedestrians in an often crowded thoroughfare must be sacrificed because of the great advantage of selling a few dollars worth of goods !

It is said individual comfort and convenience must give way to the public good, but what is the public good ? Is the promotion of the pecuniary interest of a private corporation the public good ? Is the conferring upon and the enjoyment of valuable franchises by associated private individuals, the promotion of the public good ? The overgrown power of great corporations almost always has its origin in the employment of catch-words that delude the popular imagination, and cast a glamour over what is hidden beneath. How far private rights are to be ignored in the pursuit of this *ignis fatuus*, which for the nonce is assumed to be the public good, does not yet seem to be clearly determined, but it is certain that the authorization of an act even by the legislature does not prevent it from being a private nuisance. Woods on Nuisances, 788. One has as much right to protection from noxious gases and mephitic odors transmitted through the air, as to protection

from a trespass upon his soil, and there is no good reason why courts should not guard the one as jealously as the other.

These considerations would be worthy of attention even if the defendant Company had the right to run steam trains over this part of Canal street, but it has none whatever. Apart from the dedication to public use of this central space, which the plaintiffs' counsel have presented with ingenuity, it appears the City sold the lots, or some of them, now owned by the plaintiffs, fronting on this street. This space was at one time converted into a promenade, with shelled walks, shaded by trees, and protected from the intrusion of vehicles by ornamental chains and posts. It is well stated in the opinion of the Court, as was said in French's case, 2 Ann. 87, these parties bought with reference to the reservation of this central space for public use, and where property has been thus set apart and enjoyed as such, and private and individual rights have been acquired with reference to it, it is an estoppel *in pais* which binds the original owner. Sarpy vs. Municipality, 9 Ann. 597.

It is of no consequence that the City acquired this central space after she had sold the bordering property. There is no reason why a municipal corporation may not be held to the same restrictions and responsibilities as a private individual in its contracts. ·It received for the property it sold a larger price, because in its front was a wide street which assured ventilation, the middle of which was not used for the passage of horses or vehicles, and it should not gain by the existence of a condition of its property which attracted and induced purchasers, and when it acquires the object which formed the attraction, so change its use as to destroy that attraction, and even convert it into a nuisance.

The right to run these steam trains is claimed under an Act of the General Assembly incorporating the New Orleans, Metairie & Lake Railroad Company, Acts 1869, p. 205, the defendant being the assignee and successor of the incorporators, and also under an Act of July 1, 1878, between the City and the defendant, wherein the right to run cars with steam dummy engines, is said to be recognized.

No such right is recognized by that Act. The use of a steam propeller was not contemplated at all, and it is the use of steam as a propeller of which the plaintiffs complain. The purpose of the organization is exhibited by the specifications of the contract with the City, and it was to construct and maintain a railroad within the City to be propelled by horse-power. It was a tramway rather than a railroad.

135

Unquestionably that was its original franchise, and it can only exercise a greater and different franchise by derivation of authority since the grant. It has none. The pretension that it acquired such larger franchise through purchase of the Metairie & Lake Road franchise, falls before the declaration of this Court that it is the State's prerogative to confer franchises, and they cannot be transferred without the consent of the grantor. Spanish Fort R. R. Co. vs. Delamore, 34 Ann. 1225 ; and to like effect, Thomas vs. R. R. Co., 101 U. S. 83.

Nor is the defendant's claim of a more satisfactory origin when it is attempted to be derived from the City Ordinance of August, 1876, granting permission to establish a stand for the cars on the neutral ground on Canal between Baronne and Carondelet streets, revocable at the pleasure of the Council. It was wisely revoked in June, 1880, and the stand was removed to Basin street, but the petition of the one hundred and seven, like the famous charge of the six hundred at Balaclava, won the day, and the obnoxious stand was reinstated in March, 1881.

The authority of the Council to confer this privilege upon the railroad is said to be derived from the charter of 1870, in force at the time of the grant, under that clause giving power to "regulate the proper government of carts, drays, etc., freight, locomotive, passenger and street cars, which run in the streets, and within the limits of the City."

The flimsiness of this pretence is apparent when it is considered that the power to *regulate the government* of railway cars can in no sense include the power to *grant a franchise.* The regulation of cars, etc., is simply an act of ordinary administration. The grant of a franchise is an extraordinary act—the exercise of a power inherent in sovereignty —a power obtainable only by a concession from the sovereign, the terms of which are always strictly construed.

Even if a municipal corporation has authority from the sovereign to grant a franchise, it cannot so exercise it as to create a private nuisance for which there is no redress. The legislative grant is not a protection against an action for damages resulting from the private nuisance. *A fortiori* is the defendant without protection and without excuse, since it has neither municipal authority nor legislative grant.

Rehearing refused.