## RAILROAD COMPANY *v.* RICHMOND.

1. The ordinance of the council of the city of Richmond, passed Sept. 8, 1873, that "no car, engine, carriage, or other vehicle of any kind belonging to or used by the Richmond, Fredericksburg, and Potomac Railroad Company shall be drawn or propelled by steam upon that part of their railroad or railway track on Broad Street, east of Belvidere Street, in said city," does not impair any vested right of the company, under its charter, granted Feb. 25, 1834, nor deprive it of its property without due process of law, nor deny it the equal protection of the laws.
2. The appropriate regulation of the use of property is not "taking" it, within the meaning of the constitutional prohibition.

ERROR to the Supreme Court of Appeals of the State of Virginia.

The Richmond, Fredericksburg, and Potomac Railroad Company was incorporated Feb. 25, 1834, by the legislature of the State of Virginia, "for the purpose of making a railroad from some point within the corporation of Richmond, to be approved by the common council, to some point within the corporation of Fredericksburg" (charter, sect. 1), and was authorized (sect. 24) "to place on the railroad constructed . . . all machines, wagons, vehicles, carriages, and teams of any description whatsoever, . . . necessary or proper for the purposes of transportation." It was required at all times to transport persons and property from one point to another along the line of its road, when completed, upon payment or tender of the tolls allowed by the charter. Sect. 26.

At the time of the incorporation of the company, locomotive engines were in use within the State of Virginia, upon a railroad extending from the Roanoke to Petersburg; and the city of Richmond was a municipal corporation, having power "to make and establish such by-laws, rules, and ordinances, not contrary to the Constitution or laws of the Commonwealth, as shall . . . be thought necessary for the good ordering and government of such persons as shall from time to time reside within the limits of said city or corporation. or shall be concerned in interest therein." 1 Hening Stat. 46, sect. 2.

On the 22d of December, 1834, the president and directors of the railroad company passed the following preamble and resolution: —

"Whereas, by the act incorporating this company, it is requisite that the point at which the railroad terminates within the corporation of Richmond should be approved by the common council, and it appears to the board most expedient to conduct the same from the Richmond turnpike along H [Broad] Street to a point at or near the intersection of the said street and Eighth Street, and for the present to terminate the same by suitable connections with the contemplated warehouses and workshops of the company on lots Nos. 477 and 478, purchased by them from John Heth: Therefore, be it

"*Resolved*, that the approbation of the common council be requested to the above plan."

On the 23d of the same month, the common council of the city passed the following:—

"Whereas, by a resolution of the president and directors of the Richmond, Fredericksburg, and Potomac Railroad Company, submitted to the common council, it appears it is deemed most expedient by the said president and directors to conduct the said railroad from the Richmond turnpike along H [Broad] Street to a point at or near the intersection of the said street and Eighth Street, and for the present to terminate the same by suitable connections with the contemplated warehouses and workshops of the company on lots Nos. 477 and 478, purchased by them from John Heth.

"*Resolved*, that the common council do approve the proposed location of the said railroad and the present termination of the same, as described in the foregoing resolution, and authorize the prosecution of the said work within the limits of the city on the above location: *Provided*, that in locating the said railroad no injury shall be done to the water-pipes now laid in and along said street: *Provided*, that the corporation of Richmond shall not be considered as hereby parting with any power or chartered privilege not necessary to the railroad company for constructing the said railroad, and connecting the same with the depot of said company within the limits of the city."

The railroad company then proceeded with the construction of its road, which was completed and ready for use within the city on the 15th of February, 1836. Shortly before that day, a meeting was held by some of the residents of Shockhoe Hill, at which resolutions were passed, declaring that in the opinion of the meeting the company should not be permitted to use loco-

motive power for propelling cars within the city, and that it "should be required to construct and keep in good order a free access and passing at all points from the one side of H [Broad] Street to the other." These resolutions were presented to the council, and referred to the street commissioners with instructions to ascertain and report what injury had been done to the street by laying down the railroad in it, and also what were the future plans of the company, so far as they related to the use of the road, and the probable result to the citizens resident and owning property on the street, by the execution of the plans and operations of the company.

This action of the council was communicated to the company on the day it commenced the business of transportation over the road ; and, in reply, the president and directors made a statement, of which the following is part : —

" The railroad having been made along H [Broad] Street from a point approved by the common council, the president and directors, under power given by the act of incorporation, have purchased and placed on the railroad a locomotive engine and other machines proper for the purposes of transportation. Their plan, so far as the same relates to travel on said road on H [Broad] Street, is to have the cars drawn by a locomotive. It has occurred to them that it might not be prudent for the locomotive to go so fast within the corporation as it will after leaving the city, and accordingly they have adopted a resolution directing their engineer not to suffer the locomotive, while in the city, to proceed at a rate exceeding three miles per hour."

Then follows a statement of the plan they had adopted for facilitating the crossing of the track in the street, and the reasons for it.

Upon the receipt of this communication from the company, the council adopted resolutions instructing the commissioners of streets to inquire into the expediency of paving H [Broad] Street, and to ascertain from the company whether they would pay part of the expense attending it. After a correspondence between the commissioners of streets and the committee of the company, showing the views of each side, the city surveyor was instructed by the commissioners of streets "to prepare and submit a plan, the most judicious to be adopted, for paving H

[Broad] Street, . . . having a regard as well to the just rights and interests of the city as to those of the railroad company in the use of said street." The city surveyor accordingly submitted a report, in which, after setting forth the inconveniences which would result to the railroad company by "a uniform pavement on a level with the top of the plates of the railroad," submitted a plan "as a compromise of interests." This plan was finally adopted by both parties and the work done, the railroad company, by arrangement, paying one-third the expense. That ended all action upon the resolutions adopted at the meeting of residents on Shockhoe Hill. The amount paid by the railroad company towards the paving was near $7,000.

At different times after this, applications were made to the council to prohibit the use of locomotives in the street; but the council, while asserting its right to do so, declined to take action in the matter, upon the ground that it was not expedient. Ordinances were, however, passed regulating the speed of trains and providing against standing cars in the street.

On the 24th of May, 1870, an amendment was made to the charter of the city, and the council empowered "to determine and designate the route and grade of any railroad to be laid in said city, and to restrain and regulate the rate of speed of locomotives, engines, and cars upon the railroad within the said city, and . . . exclude the said engines and cars, if they pleased, provided no contract be thereby violated." Acts of 1869–70, p. 125.

On the 8th of September, 1873, after the main line of the railroad had been changed to another route, and negotiations for the sale of the depot property by the company to the city had failed, the council passed an ordinance, as follows : —

"SECT. 3. That on and after the first day of January, 1874, no car, engine, carriage, or other vehicle of any kind belonging to or used by the Richmond, Fredericksburg, and Potomac Railroad Company, shall be drawn or propelled by steam upon that part of their railroad or railway track on Broad Street east of Belvidere Street in said city. The penalty for failing to comply with this section shall be a fine of not less than $100 nor more than $500 for each and every offence, to be recovered before the police justice of the city of Richmond."

On the 2d of January, 1874, this action was commenced to recover the penalty incurred under that ordinance for running a locomotive propelled by steam in the street. There was no dispute as to the facts; but the defence relied upon was, that the ordinance was unconstitutional and void, because, — 1, It impaired the obligations of the contract contained in the charter of the company, which, as was claimed, granted to the company the right to propel its cars by steam, as well within the city as 'thout; 2, it deprived the company of its property without process of law; and, 3, it denied the company the equal pi. ction of the laws

This defence having been overruled, and judgment given against the company by the police justice, the case was taken by writ of error, first, to the Circuit Court of the city, and, second, to the Supreme Court of Appeals of the State, in both of which courts the judgment below was affirmed. The judgment of the Court of Appeals is now here for review, under sect. 709 of the Revised Statutes, and the errors assigned present the same questions that were relied upon in defence below.

*Mr. Conway Robinson* and *Mr. Leigh Robinson* for the plaintiff in error.

1. The ordinance of the city council of Richmond, prohibiting the use of locomotive engines on the railroad of the plaintiff in error on Broad Street impairs the obligation of the contract contained in the charter of the company granted by the legislature of the State of Virginia. Cooley, Const. Lim. 87, 88, 274, 279; *People* v. *Draper*, 15 N. Y. 532; *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 519; *Planters' Bank* v. *Sharp*, 6 How. 301; *Fletcher* v. *Peck*, 6 Cranch, 87; *Terrett* v. *Taylor*, 9 id. 43; *New Jersey* v. *Wilson*, 7 id. 164; *Gordon & Chester* v. *Appeal Tax Court*, 3 How. 133; *State Bank of Ohio* v. *Knoop*, 16 id. 369; *City of Richmond* v. *Richmond & Danville Railroad Co.*, 21 Gratt. (Va.) 604; *State* v. *Noyes*, 47 Me. 189; *O'Connor* v. *Pittsburgh*, 18 Pa. St. 187; *James River & Kanawha Canal Co.* v. *Anderson et al.*, 12 Leigh (Va.), 278; *McLauchlin* v. *Railroad Co.*, 5 Rich. (S. C.) 596; *Hammersmith & City Railway Co.* v. *Brand*, 4 Law Rep. H. L. 738; *Enfield Tollbridge Co.* v. *Hartford & New Haven Railroad Co.*, 17 Conn. 454; *Black* v. *Phila-*

*delphia & Reading Railroad Co.*, 58 Pa. St. 249; *Vaughan* v. *Taff Vale Railway Co.*, 5 H. & N. 678; *Mercer* v. *Pittsburg, Fort Wayne, & Chicago Railroad Co.*, and *Commonwealth* v. *Same*, 36 Pa. St. 99; *New Jersey Railroad & Transportation Co.* v. *Jersey City*, 29 N. J. L. 170.

To justify the exercise, even by the State, of any such police power, so as to impair the franchise conferred by her legislative contract, there must be not only compensation made to the company, but also unquestionable proof that its exercise is necessary for the protection of the lives and property of its citizens from certain and imminent danger. *Black* v. *Philadelphia & Reading Railroad Co.*, 58 Pa. St. 249; *Drake* v. *Hudson River Railroad Co.*, 7 Barb. (N. Y.) 508; *Commonwealth* v. *Erie & North-East Railroad Co.*, 27 Pa. St. 339; *Mifflin* v. *Railroad Company*, 16 Pa. St. 182; *Philadelphia & Trenton Railroad Co.*. 6 Whart. (Pa.) 25; *Bell* v. *Ohio & Pennsylvania Railroad Co.*, 25 Pa. St. 161; *Lexington & Ohio Railroad Co.* v. *Applegate*, 8 Dana (Ky.), 289; *State* v. *Noyes*, 47 Me. 189; *Hentz* v. *Long Island Railroad Co.*, 13 Barb. (N. Y.) 646; *Bailey* v. *Philadelphia, &c. Railroad Co.*, 4 Harr. (Del.) 389; *Pingry* v. *Washburn*, 1 Aik. (Vt.) 264; *Miller* v. *New York & Erie Railroad Co.*, 21 Barb. (N. Y.) 513; *People* v. *Jackson & Michigan Plank Road Co.*, 9 Mich. 285; *Benson* v. *The Mayor, &c.*, 10 Barb. (N. Y.) 223.

2. That ordinance also impairs the obligation of the contract between the city and the company. *Mercer* v. *Pittsburg, Fort Wayne, & Chicago Railroad Co.*, 36 Pa. St. 99; *State* v. *Noyes*, 47 Me. 189.

3. The ordinance is unconstitutional and void, because, assuming to act under authority of the State, the council thereby "denies" to the plaintiff in error that "equal protection of the laws" guaranteed to it in the Fourteenth Amendment of the Constitution of the United States. *Fletcher* v. *Peck*, 6 Cranch, 87; *Calder* v. *Bull*, 3 Dall. 386; *Booth* v. *Woodbury*, 32 Conn. 118; *Lin Sing* v. *Washburn*, 20 Cal. 534; *Holden* v. *James*, 11 Mass. 396; *Davison* v. *Johonnot*, 7 Metc. (Mass.) 393; *Bull* v. *Conroe*, 13 Wis. 233; *Walley's Heirs* v. *Kennedy*, 2 Yerg. (Tenn.) 554; *The King* v. *Pease*, 1 Nev. & M. 690; 4 Barn. & Adol. 30; *Vaughan* v. *Taff Vale Railway Co.*, 5 H. & N. 678; *Cleveland &*

*Pittsburg Railroad Co.* v. *Speer,* 56 Pa. St. 325; *Clark* v. *Mayor, &c. of Syracuse,* 13 Barb. (N. Y.) 32.

Mr. *A. M. Keiley, contra.*

MR. CHIEF JUSTICE WAITE, after stating the case, delivered the opinion of the court.

The questions for determination in this case are: —

1. Does the municipal legislation complained of impair the vested rights of the company under its charter?

In answering this question, it becomes necessary to determine at the outset what the rights of the company, secured by its charter and affected by the ordinance in dispute, actually are. The right is granted the company to construct a railroad "from some point within the corporation of Richmond, to be approved by the common council." No definite point is fixed by the charter. That is left to the discretion of the company, subject only to the approval of the city. The power to approve certainly implies the power to reject one location and accept another; and this necessarily carries with it the further power to reserve such governmental control over the company in respect to the road, when built within the city to the point approved, as may seem to be necessary. The absolute grant of the charter is satisfied if the road is built within the city for any distance, by any route, or to any point. The company, however, desired to pass through Broad Street, and, for the present, to terminate the road upon the lots purchased for shops and warehouses, and requested the city to approve that location. This the city was willing to do, upon condition that it should not be considered as thereby parting with any power or chartered privilege not necessary to the company for constructing its road or connecting it with the depot. These terms were proposed to the company, and accepted. At that time the city was invested with all the powers "necessary for the good ordering and government" of persons and property within its jurisdiction. By the conditions imposed, these powers were all reserved, except to the extent of permitting the company to construct its road upon the route designated, and connect it with the depot. All the usual and ordinary powers of city governments over the road when constructed, and over the company in respect to its

use, were expressly retained. The company, therefore, occupied Broad Street upon the same terms and conditions it would if the charter had located the route of the road within the city, but, in terms, subjected the company to the government of the city in respect to the use of the road when constructed.

Nothing has been done since to change the rights of the parties. It is true that an attempt was made by the residents on Shockhoe Hill to induce the council to prohibit the use of locomotives within the city, and to require the company to so construct the road within Broad Street as to facilitate the crossing of the track; but all parties seemed to be satisfied then with the proposition of the company to run its engines slowly and with care in the city, and its liberal contribution towards the expense of paving the street. There is nowhere in the proceedings an indication of a relinquishment by the city of its governmental control over the company or its property. The "compromise of interests" proposed related alone to the plan of the pavement.

It remains only to consider whether the ordinance complained of is a legitimate exercise of the power of a city government. It certainly comes within the express authority conferred by the amendment to the city charter adopted in 1870; and that, in our opinion, is no more than existed by implication before. The power to govern implies the power to ordain and establish suitable police regulations; and that, it has often been decided, authorizes municipal corporations to prohibit the use of locomotives in the public streets, when such action does not interfere with vested rights. *Donnaher* v. *The State*, 8 Smed. & M. (Miss.) 649; *Whitson* v. *The City of Franklin*, 34 Ind. 392.

Such prohibitions clearly rest upon the maxim *sic utere tuo ut alienum non lædas*, which lies at the foundation of the police power; and it was not seriously contended upon the argument that they did not come within the legitimate scope of municipal government, in the absence of legislative restriction upon the powers of the municipality to that effect. It is not for us to determine in this case whether the power has been judiciously exercised. Our duty is at an end if we find that it exists. The judgment of the court below is final as to the reasonableness of the action of the council.

We conclude, therefore, that the ordinance does not impair any vested right conferred upon the company by its charter.

2. Does it deprive the company of its property without due process of law?

This question is substantially disposed of by what has already been said, as the claim of the company is based entirely upon the assumption of a vested right, under its charter, to operate its road by steam, both within and without the city, which we have endeavored to show is not true. All property within the city is subject to the legitimate control of the government, unless protected by " contract rights," which is not the case here. Appropriate regulation of the use of property is not " taking " property, within the meaning of the constitutional prohibition.

3. Does it deny the company the equal protection of the laws?

The claim is, that, as this company is alone named in the ordinance, the operation of the ordinance is special only, and, therefore, invalid. No other person or corporation has the right to run locomotives in Broad Street. Consequently, no other person or corporation is or can be in like situation, except with the consent of the city. On this account, the ordinance, while apparently limited in its operation, is in effect general, as it applies to all who can do what is prohibited. Other railroad companies may occupy other streets and use locomotives there; but other streets may not be situated like Broad Street, neither may there be the same reasons why steam transportation should be excluded from them. All laws should be general in their operation, but all places within the same city do not necessarily require the same local regulation. While locomotives may with very great propriety be excluded from one street, or even from one part of a street, it would be sometimes unreasonable to exclude them from all. It is the special duty of the city authorities to make the necessary discriminations in this particular.

On the whole, we see no error in the record, and the judgment is

*Affirmed.*

MR. JUSTICE STRONG dissented.