PROVO STY, J.
The CHIEF JUSTICE has prepared an opinion in this case, in which Justice SOMMERVILLE concurs in full, and from which Justices LAND and O’NIELL dissent. Justice PROVOSTY concurs in said opinion, except in so far as will be hereinafter stated. Said opinion is.as follows:
Defendant prosecutes this appeal from a conviction and sentence upon a charge of violating Ordinance No. 2346, Commission Council Series, by operating a “jitney,” in contravention of the provisions of section 2 of that ordinance, which reads:
“That no person, firm, association of persons, or corporation shall be permitted to conduct and carry on the business of transporting passengers on indicated routes and for a uniform fare, whether the said transportation be in vehicles operated on rails or otherwise, or be permitted to use and employ in the conduct and carrying on of such business any such vehicle until' he shall have first filed with the commissioner of public safety * * * an indemnity bond in the sum of $5,000 for each and every such vehicle so used and employed; the said indemnity bond, or bonds, to be executed by a surety company or companies duly authorized to do business in the state of Louisiana, payable to the city of New Orleans, and shall contain stipulation that any person, or persons, who may sustain damage to Ms, or their, person or property, as the result of the fault of the person, firm, association of persons, or corporation conducting such business, or of his, or their, agents, servants, or employes, he, or they, shall have his, or their, *118 right of action on said indemnity bond, as fully and to the same extent as if said bond was made and executed directly in favor of the claimant for such damages. The said indemnity bond, or bonds, shall be submitted to, and shall be first approved by, the commission council. The amount of said bond (to wit, $5,000 for each vehicle operated as aforesaid) shall always be maintained at that figure and shall not be void upon first recovery, but shall be actional against from time to time until the full amount thereof is exhausted, and, in the event that the amount thereof shall have been reduced by payment for damages, under the terms of said bond and these provisions, the person, firm, association of persons, or corporation, conducting the business as carriers of passengers aforesaid, shall furnish an additional bond for the amount so paid, so that, at all times, a bond, or bonds, of indemnity for the entire sum of $5,000 shall be carried, on each and every vehicle used, employed and operated in the business aforesaid; provided, however, that the provisions of this section shall be operative from and after the 15th day of May, 1915.”
To the charge so preferred, defendant demurred, on the grounds (which are here stated, as we understand them, though not in the precise order in which they appear in the demurrer), to wit:
(1) That, in adopting the section quoted, upon its first offering, the commission council of New Orleans violated section 10 of the city charter; (2) that said section contravenes articles 16 and 17 of the state Constitution, in attempting to confer upon the commission council the power to interpret, and determine the question of the sufficiency vel non of the bond thereby required, which is a judicial function; (3) that the business of operating a “jitney” in the streets of New Orleans, not having been subjected, by the Constitution, to the police power, cannot be subjected, to that power by the city council, and that the council is without authority, in the attempted exercise of such power, to create a misdemeanor and provide a penalty 'therefor, such authority being vested by article T59 of' the Constitution in the General Assembly; (4) that the requirement of an indemnity bond, as contained in the section in question, is not a competent exercise of the police power, but is arbitrary, discriminatory, unreasonable, confiscatory, impossible of fulfillment, tantamount to a prohibition against the carrying on, by a particular class of citizens, of a legitimate business, recognized by law, and hence is ultra vires of the commission council and in violation of the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States and of the second and sixth articles of the Constitution of this state.
Defendant introduced a number of witnesses, who testified that the surety companies doing business in New Orleans, or a number of them, had declined, or were unwilling, .to become parties to bonds such as that required by the ordinance, unless they were furnished with collateral security to the full amount of the bond and paid a premium of $50 in each case. And defendant testified that he had tendered to the city authorities a policy of indemnity insurance, which a casualty insurance company was willing to issue, in his favor, but which was not transferable. Being asked why he did not furnish the bond required by the ordinance, he replied : “Because I never had $5,000. Q. And you couldn’t get it? A. No, sir.” He also testifies that he had complied with other requirements of the ordinance, and he produced a city license for carrying on the business of “auto transfer,” and a state license for the business of “jitney mobile,” for each of which he had paid $30 for the year 1915. The record is entirely barren of evidence as to the character of the business thus designated, or its relation to any other business, activity, or condition. There is, however, some testimony from which it may be inferred that it is carried on by means of secondhand automobiles which are bought at a low price, and which carry passengers, at low" fares, on routes, selected by the operators, which have fixed termini.
1. The ground of demurrer first above stated has not been referred to in the argument, oral or written, of defendant’s counsel, and is considered to have been abandoned.
[1]2. Articles 16 and 17 of the state Constitution provide for the distribution of the powers of government to the three departments, and prohibit the exercise, by one department, of powers belonging, to either of the others, except in the instances expressly directed or permitted by the Constitution. Article 3042 of the Civil Code, as amended and re-enacted by Act 225 of 1908, reads:
“Article 3042. The debtor obliged to furnish security must offer either a surety company authorized to do business in the state of Louisiana, or a person able to contract, who has property liable to seizure within the state of sufficient value to answer for the amount of the obligation, and who is domiciled in the parish where the security is to be given.
“Whenever it shall be made to appear to the satisfaction of the judge having jurisdiction thereof that any person who has been appointed to discharge the duties of administrator, executor, tutor, curator, or any fiduciary trust whatever, is unable to give security in the parish, the judge shall have power to order that sureties residing in any other parish be received.
“Where surety is tendered of persons residing out of the parish, the judge alone shall pass on the sufficiency thereof, and shall require such proof as he may deem necessary.
“All actions on bonds against the sureties aforesaid may be instituted in the court having' original jurisdiction of the subject-matter; and the parties thereto, when legally cited, shall be subject to the jurisdiction of such court.”
It is quite evident that the jurisdiction, thus conferred on the “judge,” relates to bonds required by law in matters already within the cognizance of such judge, and that the lawmaker does not intend to restrict the liberty of con *120 tract between individuals in the matter of the giving and accepting of conventional bonds.
A person who merely 'desires to enter into a contract with, or - to obtain a concession from, a municipal corporation, in a case in which the corporation requires a bond, does not, thereby, become the “debtor” of the corporation, even though that word be interpreted in its broadest sense, and there is nothing in the statute which deprives the corporation of the right to determine for itself the character of bond and security that it will require, or that makes the determination of that question a judicial one.
[2] 3. The fact that the Constitution has not, in terms, subjected the business of operating a “jitney” to the dominion of the police power is not surprising, since that business seems to have originated since our latest Constitution was adopted. But all the Constitutions that we have had have vested in the General Assembly (all of) “the legislative power of the state,” which grant has included all of the police power, and the General Assembly has vested in the city of New Orleans so much of that power as is required by that corporation for the discharge of its functions, including the power to enact and enforce all ordinances necessary for the protection of the lives and property, for the preservation of the health, and for the promotion of the comfort, convenience, and general welfare of its inhabitants, and including, specifically, the power to regulate the use of the streets and maintain them in a safe condition.
That it was competent for the General Assembly to make such grant is beyond question, the consensus of the jurisprudence upon that subject being stated as follows:
“The municipality, as a governmental agency, must, of course, have such measure of the power [referring to the police power] as is necessary to enable it to perform its governmental functions and also those municipal functions which are necessarily and inseparably incident to its existence as a corporation. * * * After repeated challenge of municipal authority to exercise the police power, on the ground that it is a sovereign power and therefore nondelegable, the doctrine is firmly established and now well recognized that the Legislature may, expressly or by implication, delegate to municipal corporations the lawful exercise of police power within their boundaries. The measure of the power thus conferred is subject to the legislative discretion.” 28 Gyc. 693.
[3,4] 4. The remaining question is whether the particular enactment here attacked is within such limitations as are imposed upon the exercise of the police power, or, by transgressing those limitations, authorizes the intervention of the courts; and, in that connection, it becomes necessary to inquire more particularly into the terms of the grant under which the power has been exercised.
The Constitution of the state contains the provision :
“Art. 319. The electors of the city of New Orleans and of any political corporation which may be established within the territory now, or which may hereafter be embraced within the corporate limits of said city, shall have the right to choose the public officers, who shall be charged with the exercise of the police power and with the administration of the affairs of said corporation in whole or in part.”
Conceding, for present purposes, that the term “police power” as so used, means such police power as may be conferred upon the city by the General Assembly, we turn to tho legislative charter of the city, being Act 159 of 1912, and find the following, among other-, provisions, pertinent to our inquiry, to wit:
“Section 1. * * * (d) The legislative, executive and judicial powers of the city shall extend to all matters of local and municipal government, it being the intent thereof [hereof] that the specifications of particular powers by any other provision of this charter shall never be construed as impairing the effect of the general grant of powers hereby bestowed;
“(e) The city shall also have all powers, privileges and_ functions which by or pursuant to the Constitution of this state, have been, or could bo.; granted to or exercised by any city. * * * “Sec. 6. The commission council shall have the power, and it shall be their duty, to pass such ordinances, and to see to their faithful execution, as may be necessary and proper:
“1. To preserve the peace and good order of the city. * * *
“2. To suppress all nuisances. * * *
“3. To open and keep open and free from obstruction all streets, public squares, wharves, landings, lake shore and river and canal banks.
“4. To keep the streets and crossings and bridges and canals and ditches clean and in repair. '* * *
“6. To light the streets, wharves and landings and public squares. * * *
“See. 8. The commission council shall also have power: * * *
“12. To authorize the use of the streets for railroads operated by horse, electricity, steam or motive power, and to' regulate the same; to require and compel all lines of railway or tramway in any one street to run on and use one and the same track and turntable, to compel them to keep conductors on their cars and compel all such companies to keep in repair the street, bridges and crossings through of over which their cars run.
“13. To establish jails, houses of refuge, reformation and correction and to make regulation for their government; to construct, maintain and operate belt railroads and other public utilities; and to exercise general police power in the city of New Orleans. * * *
“Sec. 2S. Every ordinance purporting to grant to any person, corporation, association or firm any privilege to use or occupy any part of any street, public place * * * in connection with the conduct of any private business, shall, after having been introduced in the commission council, be advertised in full in the official journal, daily, for two weeks, and shall then be considered and passed or rejected * * * in the *122 manner provided for other ordinances. No privilege of any kind for the use of any part of any street, public place or public property in connection with the conduct of any private business, except such as are incidental, appertaining to or necessarily connected with grants of the_ character referred to in section 29, now existing or hereafter to be made, shall be granted by the commission council except on adequate consideration fixed in the ordinance granting the privilege payable, at the discretion of the * * council, either in cash before said privilege is exercised, or in installments to be paid in advance at dates to be fixed by the ordinance.”
Section 29 refers to grants for:
“The lighting of streets or public places, the lease of public markets or the establishment of. markets or other utilities to become public on terms, the operation of ferries, the removal or disposal of garbage, the construction and operations of street railroads or purporting to award a contract covering the performance or discharge of any public duty or function. * * * ”
It would be impossible to express more emphatically, than by the language thus used, the intention to confer upon the city all the power that it is competent for the General Assembly to confer upon any municipal corporation. But, even though the accomplishment should be held to fall short of the intention, it is clear that the power and obligation are conferred and imposed to maintain the streets and so regulate their use as to secure the safety and convenience of the public, to whom, alone, they belong. As far back as 1810 — before the adoption of the Constitution under which Louisiana was admitted into the Union — in the suit of Daublin v. May- or, 1 Mart. (O. S.) 185, plaintiff complained that the city authorities had demolished a house that he had built and had driven him from the premises. Defendants admitted the demolition, but justified it on the ground that the house had been built in a public street, in violation of a city ordinance. Plaintiff’s counsel cited the laws of Spain (then in force), to the effect that, “if the corporation of any eity_ are disseised of any of their land, they shall bring suit therefor, and if they use force to regain possession, they shall forfeit their title to the premises.” In deciding the so presented, Martin, J„ said:
“The ordinance of the corporation is not repugnant to the Constitution of the United States nor to any of the laws of the territory. The Spanish laws quoted by the plaintiff’s counsel relate only to lands belonging to the corporation as their private property. Streets are not the property of any one; they belong to the whole community. They are not the property of the corporation, for if they were the corporation could exclude the whole world from the use of them. On the contrary, the use of them belongs to the whole world” (citing 3 Partida and Commentary of Gregorio Lopez, and Roman La^S, Dig. lib. 43, tit. 10).
In Kennedy v. Phelps, 10 La. Ann. 227 (decided in 1855), the question presented was as to the validity of an ordinance of the then city ot Lafayette, under which the street commissioner threatened to close, as a public nuisance, certain premises used by plaintiff for the curing of hides. In sustaining the ordinance, this court quoted from the decision of the Supreme Court of Massachusetts, in the case of Baker v. City of Boston, 12 Pick. (9 Mass.) 193, 22 Am. Dec. 421, as follows:
“It has not been denied, nor it cannot be, that the mayor and aldermen are clothed with legislative powers and prerogatives to a certain extent, and that they are fully empowered to adopt measures of police, for the purpose of preserving the health and promoting the comfort, convenience, and general welfare of the inhabitants within the city. Among these powers no one_ is more important than that for the preservation of the public health. It is not only the right, but the imperative duty, of the city government to watch over the health of the citizens, and to remove every nuisance, so far as they may be able, which may endanger it.”
To which this court added:
“The police powers, thus generally recognized as essential to municipal government, have been expressly conceded to the city of New Orleans, * * * as they are, by implication, to the late city of Lafayette,” etc.
In Richmond, F. & P. R. R. Co. v. City of Richmond, 96 U. S. 521, 24 L. Ed. 734, it appeared that the plaintiff company had been incorporated in 1834, with authority to build a railroad “from some point within the corporation of Richmond, to be approved by the common council,” etc., and to place thereon “all machines, wagons, vehicles, carriages, and teams of any desciiption whatsoever” ; that locomotives were, at that time, in use in Virginia, and that the city of Richmond was a municipal corporation, having power “to make and establish such by-laws, rules, and ordinances, not contrary to the Constitution or laws of the commonwealth, as shall * * * be thought necessary for the good ordering and government of such persons as shall from time to time reside within the limits of said city or corporation, or shall be concerned in interest therein.”
It further appears that, the road having been located within the city limits, the company placed locomotives thereon, after which there were different negotiations and transactions between the company and the city, followed, in 1870, by an amendment to the city charter, authorizing the city to exclude engines and cars, provided no contract was thereby violated, and, followed, in 1873, by an ordinance, prohibiting the use of steam cars upon a certain part of Broad street, which prohibition having been disregarded by the company, the city proceeded, before a police justice, for the recovery of the penalty, and the company, by way of defense, attacked the ordinance, as unconstitutional, on the grounds that it impaired the obligations of a contract, deprived it of its property without due process of law, and denied it the equal protection of the laws. The ease was taken to the Supreme Court of the United States, and *124 it was there held that tne ordinance impaired no contract obligations, after which, the opinion proceeds as follows:
“It remains only to consider whether the ordinance complained of is a legitimate exercise of the power of a city government. It certainly comes within the express authority conferred by the amendment to the city charter, adopted in 1870; and that, in our opinion, is no more than existed by implication before. The power to govern implies the power to ordain and establish suitable police regulations; and that¿ it has often been decided, authorizes municipal corporations to prohibit the use of locomotives in the public streets, when such action does not interfere with vested rights. Donnaher v. State, 8 Smedes & M. (Miss.) 649; Whitson v. City of Franklin, 34 Ind. 392.
“Such prohibitions clearly rest upon the maxim ‘Sic utere tuo ut alienum non Ledas,’ which lies at the foundation of the police power; and it was not seriously contended upon the argument that they did not come within the legitimate scope of municipal government, in the absence of legislative restriction upon the powers of the municipality to that effect. It is not for us to determine in this case whether the power has been judiciously exercised. Our duty is at an end if we find that it exists. The judgment of the court below is final as to the reasonableness of the action of the council.”
In Tilton et al. v. Railroad Company, 35 La. Ann. 1062, it appeared that, in 1876, defendant had been granted, by the city of New Orleans, the right to operate its cars on the neutral ground on Canal street, between Basin and Carondelet; that the grant was renewed in 1883; that plaintiffs, as owners of abutting property, obtained an injunction against the exercise of the right; and that they appealed from a judgment dissolving the injunction and rejecting their demands.
This court, after a careful consideration of the question of the authority of the city to make tbe grant, in view of the character of the neutral ground, reached the conclusion that the authority existed, but, finding that it did not include the right to use steam cars, amended the judgment appealed from in that respect, and perpetually enjoined the defendant from using such cars.
Many years before, in the ease of Brown et al. v. Duplessis and City of New Orleans, 14 La. Ann. 842, it appeared that the city of New Orleans had offered for sale the right of way for the establishment of a railroad in its streets, the cars to be drawn by horses or mules, and that the adjudication had been arrested by an injunction, sued out by plaintiffs, on the ground that the power to make it was not vested in the city, but in the General Assembly.
The court quoted the following provision in the then city charter, as conferring the power, to wit:
“The mayor and * * * council shall have full power and authority to make and pass such by-laws * * * as are necessary and proper, and are not contrary to the Constitution * * * of the United States or this state: First, * * *. Second, to regulate and make improvements to the streets, public squares, wharves and other property. * * * Twelfth, to make regulations for-the proper government of carts, drays, carriages, omnibuses, and other vehicles of every description, which run in the streets, or anywhere within the limits of the city, and to determine through what streets the same shall pass.”
In the course of its opinion, the court said, in substance, that if the city had thought proper to lay tracks through the streets, for the use of those who might choose to operate their own horse or mule drawn cars thereon, no one could have complained, as that would have afforded but another, and not exclusive, mode of using the streets, from which it was deduced that, as it did not suit the public coffers to lay the rails, it was competent for the city to sell that right, with the privilege of operating cars upon the rails according to a tariff fixed by the council.
In 1-879, the right of way thus referred to (with additions, no doubt) was sold by the city for 8630,000, in cash; and in State ex rel. Gaslight Co. v. Mayor and Council, 32 La. Ann. 270, it was held that, such right being “property” within the meaning of Act 30 of 1876, the proceeds should be included in the budget for 1880 and devoted to the payment of registered judgments.
In the cases thus cited, therefore, it appears that persons desiring to conduct the business of carriers of passengers in the streets of New Orleans were required, and were willing, to pay heavily for that privilege, in addition to which the streets in which they were to operate were determined contradictorily with the city, they were required to pay the expense of laying the tracks for the use of their vehicles, and, it may be added, as a matter within the cognizance of this court, in most, if not all, cases, they were required to assume a burden with reference to the maintenance of the streets in which they operated. The question has always been, not whether the city had the power to deny such privilege, for no one, until now, has ever asserted a right to it, but whether it had authority to grant it.
The defendant now before the court and others similarly situated claim the privilege as of right. They propose to operate their vehicles, not upon rails, laid at their expense, in streets maintained in part by them, but upon asphalt, laid at the expense of the city, in streets selected by them,- but maintained by the city.
It may be here stated that, after this prosecution was instituted in the recorder’s court, defendant (with an associate) obtained an injunction from a court of civil jurisdiction to restrain the city from further proceeding and from instituting other prosecutions, on the ground that he had a property right in the use of the street for the purposes of his business; but this court, upon the city’s application for prohibition, held that he had no such right and that *126 the civil court was without jurisdiction in the premises, saying (among other things):
“The streets of the towns and cities in Louisiana being among the things that are ‘public’ and ‘for the common use,’ no individual can have a property right in such use for the purposes of his private business, unless, speaking generally, that business being in the nature of a public service or convenience, such as would authorize the grant, the right has been granted by the state, which alone has the ¡jower to make or authorize it, or by the particular city or town,acting under the authority of the state, and in such case the right can be exercised only in accordance with the conditions of the grant; that is to say, an individual seeking, but not possessing, a right of that kind, may accept the grant, with the conditions imposed by the offer, in which case he becomes bound by the conditions, or he may refuse to accept the conditions, in which case there is no grant, and without the grant so offered, or some other, from the authority competent to make it, he can never acquire the right to make use of a street as his place of business.” Le Blanc v. City of New Orleans, 138 La. 243, 70 South. 212.
The contention, however, is, that the business in which defendant is engaged is a legitimate one, “recognized under the laws of the state,” and that the condition which the city has imposed upon it is arbitrary, discriminatory, unreasonable, etc., as would be a similar condition imposed upon the owner of a private vehicle, or of a public hack, or taxicab, and the case of State v. Von Sachs et al., 45 La. Ann. 1416, 14 South. 249, is cited as authority for the proposition that the city council is without authority to require a person conducting a legitimate business to give bond for the faithful discharge of the duties connected therewith, and to answer in damages to those who may be injured through their dealings with him.
Without entering into any critical analysis of the Von Sachs Case, it is sufficient, for present purposes, to say that Von Sachs was engaged in the business of “labor agent,” conducted, as I assume, upon his own premises, with which the city had no more concern than with the thousands of other premises, occupied or used by its citizens, and that the court, without considering, and apparently without having its attention called to, the question whether the business of labor agent is one affecting the public interest, held (whether correctly or incorrectly) that it was to be regarded as a business authorized by the Legislature, and subject to no conditions other than those imposed by the Legislature. The business of the defendant now before the court is, however, conducted upon the streets of New Orleans, and the law not only authorizes the city to regulate the use of the streets, but imposes upon it the obligation of maintaining them in a safe condition for public use, so that, if there be in a street a neglected bridge, excavation, or obstruction, and a person thereby sustains injury, or loses his life, the city may be, and has often been, held to respond in damages. Dillon, Mun. Oor. (4th Ed.) pp. 887, 1203, 1284; Buswell, Personal Injuries, §§ 52, 167; McCormack v. Robin & City of N. O., 126 La. 594, 52 South. 779, 139 Am. St. Rep. 549, and authorities there cited. It may be that the courts have not, thus far, felt authorized to hold municipal corporations liable in damages for personal injuries or loss of life resulting from neglect to safeguard their streets against improper use by persons operating vehicles thereon, though we have a statute which makes them liable for the loss of property, injured or destroyed by mobs; but the moral obligation is the same in such cases-as in those in which the legal obligation is also recognized and enforced, and it seems clear that the corporations should be, and are, authorized to protect themselves against a default in the one case as in the other, and that is particularly true where, as in this instance, the operation of vehicles’ on the streets is a business which affects the public interest, and is therefore peculiarly within the dominion of the police power of the corporation.
“Municipal regulations of the use of the streets by a street railroad are an exercise of the police power of the city, and will be upheld if reasonable.” 28 Oyc. 727, 728. * * *
“The municipal regulation of vehicles of all sorts, commonly used within the corporate limits, is a valid exercise of the police power, not inherent, but granted to the corporation. * * # ^e city may prescribe what style of vehicles shall be used for public passenger service, but not for private use; what streets they must travel, if regular lines; and where hacks must stand; whether the driver may leave them, and what mark of distinction he shall wear. It may also prohibit fast driving, but not slow driving; may require a license for each vehicle ; and may assess a penalty against a public conveyance for refusal to carry a passenger.” Id. 731, 732.
From another publication of high character, we excerpt the following:
“It may be said, however, that a common carrier of passengers is one who undertakes for hire to carry all persons indifferently, so long as there is room and there is no legal excuse for refusing. A public common carrier is distinguished from private carriers by the franchises conferred upon it, and the obligations, restrictions, and liabilities with which it is charged, all flowing from considerations of public policy. It must carry all alike, and, for reasonable compensation, furnish reasonable accommodations, must continuously operate its line, and must submit to reasonable regulations. Under the definition thus given, steam railroads are common carriers of passengers as to those accepted. by them as, such, as are street railways, steamboats, and steamships engaged in passenger traffic, and proprietors of ferries, stagecoaches, and hackney coaches.” 4 R. O. L. 1000.
And, according to the same definition, “jitneys” are also common carriers.
*128 We quote again from another volume of the same publication:
“It is laid down as a fundamental principle that persons or corporations engaged in business in which the public have an interest or use may be regulated By statute.” 6 R. O. L. p. 224. * * *
“No one would venture to question the general proposition that a corporation whose property is devoted to a public use, as is that of a carrier, is subject to reasonable regulation by the state.” Id. 482. * * *
As it is not to be deduced, ,from the doctrine that a street railroad may be regulated through the exercise of the police power by a state or municipality, that a company promoting such road may establish it, at will, in any street of any city, and operate it by any power that it may find convenient or profitable, neither is it to be deduced from the doctrine that an individual who is engaged in business as a common carrier is subject to such regulation that he may select any street in any municipality for the conduct of his business, without regard to the views of those to whom the law has intrusted the administration of the affairs of such municipality, for it is in them, and not in him, that the law has vested the power and discretion to determine the manner in which the streets shall be administered, in order that they may be most safely and conveniently used by the whole mass of the people to whom they belong.
Defendant assumes the position that he is engaged in a legitimate business, recognized by law, and, though his counsel have referred us to no law which recognizes it, other than that which recognizes common carriers in general, we concede that the business of carrying passengers for hire is legitimate, but so is that of a baker, and yet it cannot lawfully be conducted in a public street, save with the consent of the city authorities, and agreeably to the requirements of section 28 of Act 159 of 1912, which declares that “no privilege of any kind for the use of any part of a street, * * * in connection with the conduct of any private business, except such as are * * * connected with grants of the character referred to in section 29 * * * shall be granted, * * * except on adequate compensation,” etc., and neither the business of baking bread nor that of operating jitneys is referred to in section 29, unless such reference be included in the language, “Every ordinance * * * purporting to award a contract covering the performance or discharge of any public duty or function,” and defendant sets up no such contract.
In considering whether the ordinance here in question deprives defendant of any right guaranteed by either the state or federal Constitution, we leave the Fourth and Fifth Amendments to the federal Constitution out of the case, as it is well settled that the first 10' amendments to that instrument relate only to powers exercised by the federal government. Articles 2 and 6 of the state Constitution contain, substantially. the same guaranty, of life, liberty, and property, and of due process of law, as the Fourteenth Amendment to the federal Constitution. It is generally conceded that the_ police power is a necessary attribute of every civilized government, is inherent in the states of the American Union, was not surrendered by them upon the establishment of that Union, and that the Fourteenth Amendment to the-federal Constitution was not intended to interfere with its proper exercise by the states, and so it may be said of the second and third articles of the state Constitution with respect to the state of Louisiana. Upon the other hand, it is also well settled that, to deny a citizen the rights guaranteed by the Fourteenth Amendment is not a competent or proper exercise of the police power, and hence that no state can deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of its laws. The views of the Supreme Court of the United States upon the proposition thus stated have been expressed as follows, in a case in which a municipal corporation, acting under a general, constitutional, and special, statutory, grant of authority, delimited certain territory within which gasworks might be established, and, after the plaintiff (who was also plaintiff in error) had acquired property and begun the establishment of such works, passed an amendatory ordinance prohibiting their erection to wit:
“The Supreme Court of California, as may be gathered from its opinion in this case, based its decision upon the proposition that, as the exercise of the right to control the location and erection of gasworks is within the power conferred by the Legislature upon the city, the act of the municipality in question cannot be reviewed, because so to do would be a substitution of the judgment of the court for that of the council upon a matter left within the exclusive control of the legislative body. To support this conclusion, a citation is made from the opinion of this court in the case of Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, to the effect that the Legislature is the exclusive judge of the propriety of police regulation when the matter is within the scope of its power. The observations of Mr. Chief Justice Waite, in that connection, had reference to the facts of the particular case, and were certainly not intended to declare the right of either the Legislature or a city council to arbitrarily deprive the citizen of rights protected by the Constitution, under the guise of exercising the police powers reserved to the states. It may be admitted that every intendment is made in favor of the lawful exercise of municipal power, making regulations to promote the public health and safety, and that it is not the province of courts, except in clear cases, to interfere with the exercise of power reposed by law in municipal corporations for the protection of local rights and the health and welfare of the people in the community. But, notwithstanding this general rule of law, it is now thoroughly well settled by decisions of this court that municipal by-laws and ordinances, *130 and even legislative enactments, undertaking to regulate useful business enterprises, are subject to investigation in the courts With a view to determining whether the law or ordinance is a lawful exercise of the police power, or whether, under the guise of enforcing police regulations, there has been an unwarranted and arbitrary interference with the constitutional right to carry on a lawful business to make contracts, or to use and enjoy property. * * 15 ”
The opinion includes an excerpt from the opinion in Lawton v. Steele, 152 U. S. 133-137, 14 Sup. Ct. 499, 38 L. Ed. 385, containing the following:
“In other words, its [the Legislature’s] determination as to what is a groper exercise of its police powers is not * * * conclusive, but is subject to the supervision of the courts.” And, from the opinion in Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780, as follows:
“The question in each case is whether the Legislature has adopted the statute in exercise^ of a reasonable discretion, or whether its action be a mere- excuse for an unjust discrimination, or the oppression, or spoliation of a particular class.”
And from Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 558, 22 Sup. Ct. 431, 439 [46 L. Ed. 679], containing the following:
“The state has undoubtedly the power, by appropriate legislation, to protect the public morals, the public health, and the public safety, but if. by their necessary operation, its regulations looking to either of those ends, amount to a denial to persons within its jurisdiction of the equal protection of the laws, they must be deemed unconstitutional and void.”
Somewhat further along, the opinion proceeds: “It is always a judicial question if any particular regulation of such right [referring to the “constitutional right of the citizen to pursue any trade, business or vocation” which, in itself, is recognized as innocent and useful to the community] is a valid exercise of police power, though the authority of the courts to declare such regulations invalid will be exercised with the utmost caution, and only when it is clear that the ordinance or law declared void passes the limits of the police power and infringes upon rights guaranteed by the Constitution.”
Applying the doctrine thus announced by it to the case under consideration, the court found that the plaintiff had acquired property under an ' ordinance which authorized the erection thereon of gasworks, and (though conceding that the police power of the municipality was a continuing power, and that conditions, thereafter arising, might have justified its exercise to prohibit such erection) that no such conditions had arisen, .and held that the prohibiting ordinance, subsequently adopted, operated to devest a vested right, protected by the Constitution, saying:
“Being the owner of the land and having partially erected the works the plaintiff in error had acquired property rights, and was entitled to protection against unconstitutional encroachments which would have the effect to deprive her of her property without due process of law. * * * Whether, when it appears that the facts would authorize the exercise of the power, the courts will restrain its exercise because of alleged wrongful motives inducing the passage of an ordinance is not a question necessary to be determined in this case, but where the facts as to the situation and conditions are such as to establish the exercise of the police power in such manner as to oppress or discriminate against a class or an individual, the courts may consider and give weight to such purpose in considering the validity of the ordinance.” Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169.
The same high court has said, in a more recent case, concerning a contention that a particular classification operated to deny a litigant before it the equal protection of the laws:
“The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: (1) The equal protection clause of the Fourteenth Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. (2) A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because, in practice, it results in some iñequality. (3) When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. ■(4) One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.” Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 Sup. Ct. 337, 55 L. Ed. 377, Ann. Cas. 19120, 160. The defendant in the case at bar has not carried the burden to which the language thus quoted refers, and I can, readily, and, as I think, reasonably, conceive a state of facts which would sustain the classification contained in the ordinance which he attacks, though it excludes taxicabs and private vehicles.
There are authorities to the effect that: “When an act has a real and substantial relation to the police power, then, no matter how unreasonable or unwise the measure itself may be, it is not for the courts to avoid or vacate it on constitutional grounds.” 6 R. C. L. p. 243.
[5, 6] I am of opinion that the real and substantial relation of the ordinance here in question to the police power of the city is sufficiently obvious, but I concede that, the grant of power under which it was enacted being general, rather than specific, the reasonableness of its provisions may be open to inquiry. I begin that inquiry, however, by assuming the existence of conditions requiring the enactment of such an ordinance, and there is no evidence in this rec *132 ord which rehuts that presumption. To the contrary, defendant has referred to no ease, and I know of none, in which it has been held, or even pretended, that an individual or corporation could engage in the business in which he is engaged, upon the streets of a town or city, without complying with conditions imposed by the governing authorities, and the reasonableness of such conditions should be determined as well, to say the least, with reference to the purpose intended to be accomplished, as to the convenience, or the ability to comply, of the person upon whom they are imposed. I infer, from the evidence introduced on his behalf, that defendant is without means, and that he is engaged in operating a secondhand vehicle, impelled by steam, explosive gas, or electricity, and capable of moving at a very high rate of speed, in which he carries passengers over a route, established by .himself, through the streets, from one fixed terminus to another, for a very low fare, all of which suggests to the mind the possibility of an accident, whereby some man, woman, or child, dependent, perhaps, upon his, or her, daily efforts for a livelihood, and making that ordinary use of the streets for which they are mainly intended, may be killed or permanently disabled. I am not informed by the record whether there are a hundred such jitneys in operation or a thousand, or at what speed, or upon what streets they travel, or whether danger of the accident suggested is imminent or remote, or whether all the jitney operators, together, could satisfy a verdict or judgment for the damages resulting from one such accident. Those are matters which may be within the knowledge of the city council, and it is to be presumed that it was upon the basis of such knowledge that they concluded that it would be reasonable for them, as administrators of the streets, responsible for their safety, and as representing the mass of the inhabitants, to require from each jitney operator a bond of indemnity for loss or injury that he may inflict upon them in the course of the .extraordinary use that he is making of the common property. Considering the requirement from that point of view, it seems not unreasonable, since $5,000 would hardly cover the loss which may result from a single accident, and a cheap, secondhand, machine, operated cheaply, in order to make profit from cheap fares, may reasonably be expected to meet with accidents. And, considering the matter from that point of view, it appears to me to be immaterial whether the operator can give the required bond or not; for, if he be without money to pay the damages that he may inflict, and without credit to enable him to secure the possible sufferers against such damages, it is, I think, within the police power of the city authorities to declare that he shall not operate his machine. There may be persons desiring to operate jitneys who are unable to pay for a license, as there are, at times, persons desiring to suspend the execution of final judgments, who are unable to give the required bonds, but the requirements of the license and the bond are not unreasonable on that account. There may be auctioneers and notaries who think the bond requirement a hardship, but we have heard no complaint from them, and have good reason to think the requirement a reasonable one.
A late writer on the subject of police power says:
“Somewhat related to the requirement of a license is a bond or deposit to secure the faithful compliance with police regulations and the satisfaction of liabilities that may arise from their violation, or to serve as an indemnity bond for persons who have suffered by the fraudulent conduct of the business. As- a subsidiary measure of police control, it appears to be permissible, wherever a license may be required, but it is resorted to less frequently. A bond is required, not uncommonly, of liquor sellers and of auctioneers; deposits are sometimes required of peddlers, itinerant merchants, of persons advertising bankrupt sales; above all, of all persons or corporations engaged in the quasi public business of banking, insurance, or warehousing.” Freund on Police Power1, § 40, page 36.
The courts of several of the other states have had occasion to consider the questions here in issue, and have decided that laws and ordinances, similar to the ordinance involved in this ease deny no rights secured by the Constitution. Green v. San Antonio (Tex. Civ. App.) 178 S. W. 6; Ex parte Sullivan (Tex. Cr. App.) 178 S. W. 537; State ex rel. Ryals v. City of Memphis (Tenn.) 179 S. W. 631; Memphis Street Railway Co. v. Rapid Transit Co. (Tenn.) 179 S. W. 635; Ex parte Cardinal (Cal.) 150 Pac. 348 [L. R. A. 1915F, 850]; State v. Howell, 85 Wash. 294, 147 Pac. 1159; Ex parte Dickey (W. Va.) 85 S. E. 781 [L. R. A. 1915F, 840].
Justice PROYOSTY cannot concur in the view that the jitneys are not entitled, as matter of right, to use the streets, but are dependent for doing so upon the consent of the municipal authorities. The streets belong t'o the public; and the jitneys, as part of the public, have the right to use them. The city of New Orleans possesses all the powers of the Legislature in the premises; but the Legislature itself is powerless to interdict the use of the streets to vehicles such as commonly, in every city the world over, use them. As well might it attempt to interdict the use to pedestrians. Such a statute w'ould be, in effect, depriving these pedestrians of liberty and property without due process of law. Perhaps the situation might be different if the state or the city, .were not the mere agent, or trustee, of the *134 public for the administration of the streets; but were owner of the fee, or,- in other w'ords, had the perfect ownership of the space occupied by the streets; though, even then, the abutting property owners on the street would be, in a measure, deprived of their property if the use of the street were not left free to all; but the state or. city possesses n’o such ownership, and can do no more than exercise whatever control over the streets is consistent with the use to which they are destined. Perhaps when automobiles first appeared they might have been excluded from the streets as being t'oo dangerous to be allowed to travel thereon. But the time has passed when this might have been done. Their use upon the streets is now an established thing; and as well might the attempt now be made to exclude horse-drawn vehicles as to exclude these self-moving ones. No go'od legal ground could be found by any particular city to deny to these vehicles the use of its streets when every other city the world over allows such use as a matter of course.
And the fact that these jitneys use the streets for carrying on a private business brings no change in the legal situation. That is what streets are for, to be used in carrying on private business. Everything animate and inanimate, that moves upon them may, to some extent, be said to be using them for carrying on a private business. The express companies and the breweries and the cotton presses and the wholesale grocers, all with their ponderous vehicles, use them for carrying on a private business, and they d'o so as a matter of right; and it is a right of which the Legislature would be powerless to deprive them. So long as in using the street they do not interfere with th& like use of it by others, they are entitled so to use it, not as a privilege accorded to them by the city, but as a right, a right which they possess as part of the public which 'owns the street of which the city is merely the administrator.
As such administrator, the city is vested with full authority and power to make all needful rules and regulations; but under the guise of a mere rule and regulation it .cannot impose a condition which in an indirect way will operate as an interdiction. If the circumstances are such that either from the nature of certain vehicles or fr'om the common and usual manner of operating them, the public safety is endangered so that the public welfare demands their being regulated, the right and duty on the part of the municipal authorities to regulate them becomes clear. But they cannot prohibit, neither directly nor indirectly.
What the particular mode ’of regulation shall be is a matter necessarily very largely, if not entirely, within the discretion of those charged with the duty of regulation. If in their opinion the public safety requires that a bond shall be given conditioned as prescribed in the ordinance in question in this case, such a regulation has nothing unreasonable in itself; and might well be, in fact, the only regulation suitable to the case; in other words, that would likely prove effective. It is not for the judges of the courts to say that they know better than the municipal authorities what particular kind of regulation the exigency of any particular case calls for.
But inhibition is not allowable under guise of regulation; and a regulation which in-its practical operation has the effect of an interdiction is an interdiction. While the giving of a bond may be required, this bond cannot be required to be signed by a particular surety, if so be that that particular surety will not sign it. All that can be required is that it be signed, by good and solvent surety. For instance, if vehicles of a certain class are prohibited from using the streets without furnishing a bond signed by *136 a specified bank, and this bank refuses to sign the bond, this would be tantamount to a prohibition to use the streets. In the case at bar, the b'ond is not required to be signed by a specified bank, but it is required to be signed by certain companies which refuse to do so, so that the case stands just as it would do if, instead of these companies, a specified bank were required to be the surety. Good bond may be' required, but without specification of wh'o the surety shall be.
The companies will sign the bond if collateral security in a like amount be deposited either in cash, or by means of first mortgage upon property exceeding in value by 40 per cent, the amount of the bond; and it is suggested that, since the bond may be obtained on these conditions, the requirement to give it does not operate as a prohibition. But manifestly it does, since the condition is so onerous that it is practically prohibitive. A condition imposed upon the city railways company to deposit $5,000 in cash, or to give a first mortgage in that amount upon property exceeding the mortgage in value by 40 per cent., for each one of its cars, for permission to operate them, would put' that company out of business at once. As a matter of fact, the imposition of such a condition would put the jitneys out of business.
While the automobile engaged in the jitney business is an ordinary automobile, yet, by reason of the business it is engage°d in, it forms a class by itself. To deny this is to deny a fact patent to everybody. This business would seem to be the logical outcome of the combination of cheap automobiles and asphalted pavements. Everybody knows that the carrying on of this business is not the ordinary use of an automobile. Until very lately this business was unheard of, unthought of. It manifested itself suddenly like a crop of mushrooms after a rain. Its coming into existence was an event in municipal life, heralded as such by all the newspapers of the country. It shows itself as a formidable competitor of the street railway; in fact, looms up as a menace to the continued existence of that system of urban transportation as at present conducted. The singling of it out for special regulation if in the judgment of the city authorities special regulation is called for in the interest of the safety and convenience of the rest of the public, is entirely justified.
Summing up the foregoing, the streets belong to the public; pedestrians are entitled to use them, and so are such vehicles as customarily do so, and not as a privilege accorded to them ex gratia by the city, but as a matter of right, they being part of the public. Automobiles, by custom prevalent the world over, use the streets of cities like other vehicles, and therefore have the same right to do so as pedestrians, carriages, and wagons ; but by reason of their mode of locomotion, their bulk and weight, and their possible speed and quickness of movement, their operation upon the streets presents special dangers to the rest of the public using the streets, and this furnishes a legal basis, or justification, for special regulation. The jitneys are automobiles, and therefore are entitled to use the streets as matter of right, but they are automobiles used in a peculiar way, which sets them apart in a class by themselves, a fact well recognized the country over. And if, owing to this special use, special regulation is necessary for the safety and convenience of the other users of the street, such special regulation is justified, and the question of what it shall consist of is a matter within the discretion of the municipal authorities, with which the courts have no right to interfere in the absence of clear abuse. Prohibition, however, is not regulation, and if, under the guise of a regulation, a measure be in fact a prohibition, it transcends the municipal power. Such regulation may consist in the requirement of a *138 bond conditioned like tbe one provided for by the ordinance in this case, provided this bond be not made prohibitive in its nature, either by being made too large, in amount or by being unnecessarily restricted as to the sureties who may sign it.
Another point in the case is that the ordinance. provides that the bond in question, even though signed by one or more of the surety companies, shall still be subject to the approval of the commission council. Acts 41 of 1894, and 71 of 1904, provide that said companies may not do business in the state without having obtained a certificate from the secretary of state, and that:
“Such certificate shall be conclusive proof of its solvency and credit for all purposes and of its right to be accepted as such sole surety and its sufficiency as such.”
If by the expression “approval by the commission council” is meant approval as to the sufficiency of one of the surety companies as surety, the said provision is equivalent to a reserve by the commission council of the right to reject a bond which by statutory law is declared good and sufficient, and the reserve of this right would be tantamount to a reserve of the right to refuse to allow certain jitneys to operate, while allowing others to do so. Such a provision would be clearly illegal. But it is to be assumed that by the said provision the said ordinance meant nothing of that kind, but simply that, the commission council reserved to itself the right to see to it that the bond was duly signed by one of the surety companies, and in all other respects conformed with the requirements of the ordinance.
Three of the Justices concur on the following decree:
It is ordered, adjudged, and decreed that the judgment herein be, and the same is, set aside, and that the demurrer be sustained, the accused ordered to be discharged without day.'
The CHIEF JUSTICE adheres to the views expressed in the opinion prepared by him, and respectfully dissents from those upon which the decree now handed down is based, as also from the decree. LAND and O’NIELL, JJ., concur in decree, and hand down reasons. See 71 South. 257, 258. SOMMERVILLE, J., dissents.