## CLINTON v. CITY OF WEST MONROE.

No. 5846.

Court of Appeal of Louisiana. Second Circuit.

Jan. 10, 1939.

Rehearing Denied Feb. 6, 1939.

Writ of Certiorari and Review Denied March 6, 1939.

McBride & Goff, of Ruston, for appellants.

Hudson, Potts, Bernstein & Snellings, of Monroe, and W. Decker Moore, of West Monroe, for appellee.

TALIAFERRO, Judge.

This tort action is a companion case to three others below described, all of which grew out of the same accident. The cases were consolidated for trial in the lower court but separate judgments were rendered. They were consolidated for argument here and separate judgments will be rendered.

At about the hour of 4 o'clock a. m., January 3, 1937, the automobile of Elmer E. Madden, then being operated by him, plunged into an open and unguarded ditch within the corporate limits of the city of West Monroe, Louisiana, and he and Alf P. Golden and Golden's wife, riding also on the front seat, were instantly killed from the impact. Nathaniel A. Clinton, who occupied the rear seat of the car, died on January 8th from pneumonia superinduced by injuries received in the collision and exposure at its scene.

Plaintiff herein, Harry P. Clinton, as the dative tutor of the minor, Nathaniel A. Clinton, Jr., sole heir of his said deceased father, seeks to recover damages alleged to be due the minor because of the father's death.

Mrs. Pinkie Hodges Madden, surviving widow of Elmer E. Madden, instituted suit against the City of West Monroe to recover the damages she suffered on account of her husband's death. Her suit bears No. 5843 in this court.

Mrs. Birdie Willis, divorced wife of the said Madden, in the capacity of natural tutrix to Joe Edward Madden, a minor, the sole issue of her marriage to the deceased, sues to recover damages sustained by the minor as a result of his father's death. This suit bears No. 5845 here.

W. T. Perritt, legal tutor of the three minor children of the deceased Goldens, seeks to recover damages for them on account of their parents' death. The suit bears No. 5844 in this court.

The gravamen of plaintiffs' complaint against the City is that this deep ditch or canal, admittedly dug and maintained by the City for drainage purposes, having been left open and unguarded at the north-

ern end of North 4th street, where the accident occurred, with no signs or other warnings to apprise the traveling public of its presence, constituted gross negligence and carelessness which was the sole and proximate cause of the frightful tragedy which took the lives of said four persons. It is specifically alleged that by allowing the said ditch to remain open and unguarded, as aforesaid, the City created and maintained a veritable "deathtrap or pitfall" into which persons ignorant of its presence, without negligence or lack of care on their part, would fall and be injured or killed.

In the Madden case (No. 5843), in limine, defendant filed an exception of no cause and no right of action, which was overruled.

Defendant's answers in the Madden and Willis cases are identical in substance and in defenses set up. Both cases are defended on these grounds,—

1. That the said ditch was maintained by the City as a portion of its drainage system, designed to promote the health of its citizenry and to improve sanitary conditions therein, for which no charge was made against anyone, the same being from its very nature governmental, and is non-profit producing;

2. That defendant was guilty of no negligence whatsoever as a cause or a contributing cause of the accident; and

3. That the accident was solely caused by the wanton and reckless negligence of the said Madden, operator of the car, in these respects:

(a) That immediately prior to said accident, he was driving in a northerly direction along North 4th street at a dangerous, excessive and careless rate of speed, in excess of 60 miles per hour, and continued to so drive until he crossed Crosley street (running at right angles to North 4th) and then on over the intervening 180 feet on said North 4th street to and into the ditch;

(b) That said rate of speed was reckless, negligent and in wanton disregard of his own safety and the safety of the other occupants of the car for the reason and because it was then raining and that portion of the street north of the intersection was unpaved, rough and muddy; and that he should have reduced his car's speed to a rate commensurate with safe operation in view of prevailing conditions and circumstances;

(c) That he violated both the State and City laws in driving as aforesaid;

(d) That Crosley street at its intersection with North 4th is a right of way street, by ordinance of said City, and therefore Madden should have brought his car to a complete stop before proceeding across the intersection, which he did not do, and, it is argued, had he done so the presence of the large ditch ahead of him would probably have been detected;

(e) That the said Madden had been drinking to excess for several hours prior to the accident, and when it happened was in an intoxicated condition and wholly incompetent to drive a car; that for these reasons he was driving in the manner above related.

4. That the elevation of the northern bank of the ditch at North 4th street was one foot or more higher than that of the southern bank and would have served as a notice of the presence of the ditch, had Madden been operating his car at a careful and reasonable rate of speed at the time of the accident;

5. In the alternative, should it be found and held that the accident was attributable in any degree to the carelessness or negligence of defendant, in such event, it is also pleaded that Madden's carelessness and negligence, in the respects above enumerated, contributed thereto, as a proximate cause thereof and for this reason his widow and heirs are precluded from recovering the damages sued for by them.

In the Clinton and Perritt cases (Nos. 5844 and 5846), the defenses urged by defendant are in substance and effect the same as those set up in the Madden and Willis cases, with such additional averments as were deemed necessary because of the alleged status of the Goldens and Clinton with respect to Madden, the owner and operator of the ill-fated car. These additional allegations, in substance, are,—

That the Goldens and Clinton were riding with Madden as members of a party engaged in a joint adventure and joint expedition for their mutual pleasure on the night of the accident and visited various saloons, bars and night clubs in and about the cities of West Monroe and Monroe; that all four parties indulged freely in drinking intoxicating liquors at the said places; that Madden became too intoxicated to be a proper or prudent driver of the car, all to the knowledge of the other three parties; that these parties were negligent

and contributorily negligent in occupying the car while being driven by the said Madden in an intoxicated condition, and by failing to protest against the manner of its operation by him. These alleged acts of negligence by the three deceased persons, in the alternative, are urged in bar of recovery by plaintiffs, the tutors of their children.

The demands of all plaintiffs were rejected below and they bring appeals.

In this court an exception of no cause and no right of action has been filed in each case. These exceptions are buttressed upon the well recognized legal principle that a municipality may not be held in damages resulting from torts committed by it or its agents while in the discharge and performance of duties and functions purely governmental. In support of this contention appellees cite: In re Commissioners of First Draining District, 27 La.Ann. 20, and Rome v. London & Lancashire Indemnity Company of America, 181 La. 630, 160 So. 121. This general principle is justified from the fact that when a municipality, the creature of the state, exercises powers and functions purely governmental in their nature, it is simply discharging duties which inhere in and are primarily encumbent upon the state. The municipality, in such circumstances, acts as the agent of the state, the representative of sovereignty, and is immune from liability for damages caused by its own public agents or servants. But the rule, strict as it is, has in this state at least one exception. A municipality may be held in damages to those injured because of its failure to keep its streets and sidewalks in a reasonably safe condition for travel. If this were not true, persons who desire to use such streets and sidewalks could never safely assume that they are in such condition to warrant travel thereon. If so used, they would have to keep their eyes constantly glued on the surface before them and at night carry a lighted lamp for protection against injury. Holes, pits and excavations in the streets or sidewalks could be left by the agents or servants of the municipality, resulting in death or severe bodily injury to its citizens, with no recourse for damages by anyone, but for the exception to the rule now so well recognized in this state. The jurisprudence of the state is replete with cases enforcing the principle embodied in the exception and condemning municipalities in damages to persons injured because of bad repair of their streets or sidewalks. O'-

Neill v. City of New Orleans, 30 La.Ann. 220, 31 Am.Rep. 221; Lemoine v. City of Alexandria, 151 La. 562, 92 So. 58, and cases therein cited; Holbrook v. City of Monroe, La.App., 157 So. 566; Robinson v. City of Alexandria, La.App., 174 So. 681; McQuillin on Municipal Corporations, Volume 7, § 3013, pp. 268, 269.

We quote the following from Howard v. City of New Orleans, 159 La. 443, 105 So. 443, 444, wherein the court, after citing many cases holding that municipalities may be condemned in damages under the circumstances and conditions above related, said: "The rulings in these cases are correct. They are in accordance with what may be said to be the universally recognized principle that a municipality is liable for negligence in failing to keep its streets and sidewalks in repair or in reasonably safe condition for travel. While the duty of a municipality to keep its streets and sidewalks in safe condition may be said to be a governmental duty, yet the rule that makes it liable for negligence in failing to exercise the governmental function of keeping them in repair is an exception to the rule above stated, to the effect that a municipality is not liable in damages for failure to exercise a governmental function intrusted to it, or for the negligence of its agents in exercising it, and, being an exception to the rule, necessarily does not overthrow the rule. Schwalk's Adm'r v. City of Louisville, 135 Ky. 570, 122 S.W. 860, 25 L.R.A.(N.S.) 88; Snider v. City of St. Paul, 51 Minn. 466, 53 N.W. 763, 18 L.R.A. 151."

A close examination of the cases above cited by appellees discloses that they are not in point. The holdings therein do not contravene what the court so clearly held and announced in the Howard case, supra.

The exceptions, for the above assigned reasons, are not well founded and are now overruled.

The deceased, Madden, lived in the city of Ruston, Louisiana. During the afternoon of Saturday, January 2, 1937, he drove to the home of W. T. Perritt, four miles north of Ruston, and was there joined by Alf P. Golden and his wife, a daughter of Mr. Perritt. The three left together for the ostensible purpose of driving to Columbia, Louisiana, to get some clothing of the Goldens. They had recently moved from Columbia to Perritt's place where they intended making a crop during that year. It is evident that the party,

if they originally intended to do so, never reached Columbia that day. They passed through the village of Choudrant, a few miles east of Ruston on the paved highway leading to Monroe about 8 o'clock that evening, and at that place J. L. Colvin and a man by the name of Shavers boarded the car. The party arrived in West Monroe near the hour of nine o'clock. Some strong drinks were there imbibed, after which they crossed the new traffic bridge, drove through the city of Monroe and beyond to a roadhouse and dancing hall euphoniously denominated "Little Casino".

It so happened that during the same evening another party, bent on the same sort of pastime, was organized at Jonesboro, Louisiana, whose ultimate objective also was the Little Casino. This party consisted of Clifton Ledford, owner and operator of the car, W. J. Whitlock and Nathaniel A. Clinton. They tarried in the city of Monroe a sufficient length of time to take several drinks, and then headed for the roadhouse. This party and the Madden party arrived there at about the same hour, ten o'clock. All drank and/or danced for the ensuing six hours, in fact until the proprietor indicated a purpose to close the Casino for the night. The testimony is somewhat conflicting as to the degree of drunkenness some members of the two parties attained during the six hours they were there, excepting Clinton. All agree that for a considerable time before leaving the place he was so totally and wholly intoxicated as to be unable to move about on his own power. In the vernacular of the revelers, he "passed out".

A brief time before the Madden party, excepting Colvin and Shavers, left the scene, Clinton was carried by two men and deposited on the rear seat of the Madden car. Ledford discovered him there and, feeling some responsibility for his safety inasmuch as he was his guest, removed him from the car and carried him back into the dance hall where he was left. On returning, some fifteen or twenty minutes later, Ledford was unable to find Clinton and he then drove away without him. During Ledford's absence, Clinton was again assisted from the building by Madden and another man and again deposited in the rear seat of Madden's car. Golden and his wife had previously entered it and were then on the front seat. Madden took the wheel and the party was again on its way to Ruston. The hour was around 4 A. M. The car was seen to zigzag as it

moved off. Unfortunately for the four, Golden desired to visit a sister living on North 4th street in West Monroe. They stopped there for ten or fifteen minutes. Only Golden and his wife went in. The distance between this residence and the locus of the accident is not shown. We infer that it is several blocks, however. As soon as Golden and his wife reentered the car, it was away at a rapid speed up the street. We are convinced that the car's momentum increased as it approached Crosley street. The hour was early; no traffic was there to hinder fast driving. Madden and the Goldens desired, evidently, to reach their respective homes before daylight broke upon them. They were ignorant of the fact that North 4th street ended at the ditch. They doubtless assumed that this street, as is true of all other north and south streets of the city, finally intersected the paved highway leading westerly to Ruston.

North 4th street is paved to its intersection with Crosley, a graveled street. The two cross at right angles. Traffic on Crosley has right of way over that on North 4th. A shallow drain ditch parallels the south side of Crosley street, separating its surface from the surface of North 4th. This ditch is covered with boards, the level of which is several inches below the level of the street surfaces. That part of North 4th street north of Crosley to the canal, 140 feet distant, is not surfaced with any road-building material save, prior to the time of the collision, some gravel had been deposited in the pits and holes therein as an accommodation to the only resident thereon owning an automobile. This had probably been scattered over small areas by cars. It rained the night of the accident and this portion of the street was soft and muddy. Its surface was rough; holes filled with water were numerous. The City made little pretense toward maintaining it, although dedicated as a street on the plat of the subdivision in which it is located. There were but two residences on this part of North 4th street and these were on its east side, as are the electric light poles. The locus is fairly well lighted at night.

The City maintained a stop sign in tall, bold letters on North 4th street a few feet south of its intersection with Crosley which could easily be discerned many yards away. There is some testimony indicating that this sign was not present the morning of the tragedy, but we are disposed to believe it

was there at the time. Madden's car faced it as it approached the intersection.

It is not contended that there were any unusual signs maintained by the City at the intersection to warn traffic of the presence and proximity of the canal; no barricade stood between it and the street, but one was erected by the City's employees soon after the accident.

It is established that a few years prior to this accident, another car was driven at nighttime along North 4th street into this ditch, of which event the Mayor and other officials of the City were informed. Luckily there was no fatality. This accident should have forcefully impressed the City officials with the potency of this open ditch as a "death-trap"' and impelled them to the performance of acts adequate to prevent a repetition of it. It was gross carelessness and negligence on the part of the City to leave the ditch at this point open and unguarded prior to the first accident. It was palpably worse to do so thereafter.

The state, by virtue of legislative enactments (Acts 145 of 1926 and 104 of 1932), has delegated to the City of West Monroe the power to lay out, construct, and maintain streets and roads therein and to exercise plenary jurisdiction thereover. Section 6, subds. 14 and 22. In the exercise of these powers the correlative obligation rests upon the City to employ the utmost care to protect all persons lawfully using its streets, sidewalks and roads, and who exercise ordinary care in doing so, from injury. Persons lawfully using such property of the municipality have a right to assume that they are in a safe condition to travel upon. McCormack v. Robin et al., 126.La. 594, 52 So. 779, 139 Am.St.Rep. 549, and the many cases therein cited; City of New Orleans v. Le Blanc, 139 La. 113, 71 So. 248; General Securities Company v. Hammond, 11 La.App. 306, 123 So. 399.

Therefore, unless barred by the alleged contributory negligence of the decedents; plaintiffs should recover.

We are satisfied from the testimony of several citizens living on or near to North 4th street, not far from its intersection with Crosley, all of whom save one were aroused from sleep by the noise of the Madden car, that it was going at a very high rate of speed at the time of and immediately preceding its precipitation into the ditch. It did not stop at nor slow down when crossing the intersection. In thus operating the car, Madden violated several prohibitory laws.

The ditch is between 20 and 25 feet wide at its top. It is 7 feet deep at its center. The banks are nearly perpendicular. The car's excessive speed is best reflected from the undisputed fact that its front bumper and casings struck the north bank of the ditch only about one foot from its top. The bumper was left imbedded in the dirt. This indicates quite conclusively that the car's speed was so rapid that its front end descended very little, if any, from the time it cleared the south bank until it struck the north bank. Another fact strongly corroborative of our conclusion regarding the speed of the car is that because of the terrific force of the impact, the life of each occupant of its front seat was instantly and literally "knocked out".

It is probably true that neither Madden nor the Goldens was well acquainted with that part of the City surrounding the locus of the accident. Lack of such knowledge did not warrant them to assume that street conditions were safe for travel at the speed their car was making, and especially so as regards that part of North 4th street above its intersection with Crosley. When their car left the pavement, bounced over the board-covered bridge, crossed the gravel on Crosley street, 50 feet wide, and entered upon the slippery surface of the muddy portion of the street, they should have realized that, if they were in condition to do so, from these physical conditions they were on an unimproved street, possibly beset with hazards. They were traveling in a city having many hard-surfaced, paved and graveled streets. To go from these onto a street with a rough, muddy surface, it seems to us, should have acted as the most impressive evidence that it might be hazardous to blindly continue thereon, particularly at an excessive rate of speed, such that it was impossible to bring the car to a stop within the distance illumined by its headlights. Ordinary prudence dictated that they should then and there inform themselves of the true situation by slowing down the car or by bringing it to a complete stop. It was negligence of the rankest sort for Madden to operate his car in the manner above discussed and this negligence, concurring with that of the City, made the accident possible. Without it there would have been no accident. This being true, Madden's widow and

sole heir are without recourse against defendant for the damages sued for.

■■■■ We do not think the Goldens' status, as regards responsibility for the tragedy, in contemplation of law, different from that of Madden. It is beyond debate that they left Ruston to enjoy a night of fun and frolic. Consumption of strong drink was indispensable to the success of the adventure. This was not overlooked. All drank freely and continuously and all were to a greater or lesser extent under its influence when they left the dance hall. Sufficient time to become sober had not elapsed before the accident. Intoxication does not wholly incapacitate a chauffeur to operate an automobile. It does affect his ability to operate one safely. The fact that Madden was able to drive the car does not prove that he was sober. The manner and method of the car's operation on North 4th street argues strongly in support of the contention that he was too much intoxicated to be a safe driver and no one knew this better than did the Goldens. The three were crowded together on the front seat. They knew Madden was violating the law, driving as he was, in several respects. While the lips of all three are silent in death and therefore they may not be heard on the subject, it does not require a dangerous stretch of the imagination to believe that the manner and method of Madden's driving met with their approval; at least, their acquiescence. Each of the three was anxious to reach his or her destination as quickly as possible, and each had the same interest in rapidly covering the intervening distance. Certainly, their attitude and actions in the respects mentioned render them guilty of independent negligence of a type sufficient in law to bar recovery by the tutor of their children. Livaudais et al. v. Black, 13 La.App. 345, 127 So. 129; Richard v. Canning et al., La.App., 158 So. 598, 599.

In the latter case, the court made use of the following language apropos of the question before us.

"The evidence does not conclusively show that plaintiff was in the condition in which we find that his friend was, but, if he was entirely sober, then his better judgment should have prevented his accepting so dangerous an invitation.

"Canning's condition must have been obvious. He and Richard had been together for several hours, and though, at the various homes at which they visited, they may have been separated for a few moments they were sufficiently together for Richard to have become fully aware of the fact that his friend was imbibing freely of intoxicating liquors.

"If it is actionable negligence to rent or loan an automobile to one who is manifestly intoxicated (Baader v. Driverless Cars, Inc., 10 La.App. 310, 120 So. 515), then it is certainly negligence, which will prevent recovery, to ride with a driver obviously under the influence of liquor."

In Winston's Administrator v. City of Henderson, 179 Ky. 220, 200 S.W. 330, 332, L.R.A.1918C, 646, we find the following expression pertinent here: "When two or more persons voluntarily drive or ride an automobile upon a public highway at a dangerously high rate of speed merely for the purpose of enjoying the exhilarating and pleasurable sensations incident to the swirl and dash of rapid transit, they may properly be said to be engaged in joy riding. Such joy riders not only assume the risks of danger attendant upon the sudden and violent movements of the car, but also such as arise from the inability of the driver, when traveling at a high rate of speed, to make short quick stops to avoid collisions, or defects in the street, or direct the car at bends or curves in the road so as to keep it in the traveled way."

The following rule is laid down by the court in Aaron v. Martin et al., 188 La. 371, 177 So. 242: "A guest who was sitting on front seat of automobile which struck box car at crossing at night was contributorily negligent as matter of law and could not recover from railroad or from mill owner whose employees were operating switch engine on spur track for injuries sustained, where guest was aware of track, automobile driver was not confronted with sudden emergency, box car having blocked all or nearly all of crossing, and guest did not warn driver to be cautious."

Lorance v. Smith et al., 173 La. 883, 138 So. 871, in principle, supports what the court said in the Aaron case, supra.

■■■■ Clinton's status as a passenger in the Madden car was not the same as that of the Goldens. He did not accompany the Madden party to the road house. He was not scheduled to return to his home nor to Ruston with them. He was Ledford's guest and but for the fact that he was loaded into the Madden car in a stupefied, drunken condition, he would doubtless be

living today. He fell asleep from excessive drinking before being placed the first time in the Madden car and when returned to the hall by Ledford, again went to sleep with his face in his hands on a table. In each instance, he had to be assisted by, a man on either side to enable him to get into the car. The testimony on the point is not conclusive, but it is our belief that Clinton curled up on the rear seat of the car and again fell into that soundness of sleep his mind and body so badly craved. He was largely, if not wholly, oblivious of his situation and of happenings about him. Doubtless he did not know where he was or whence bound, when injured. The fact that he was so intensely drunk and asleep in the car, in view of the facts of the case, cannot correctly be made the basis of a charge of negligence or carelessness against him to the extent, at least, of denying recovery of damages sued for by his heir.

The fact that a guest falls asleep in a car does not, as a rule, amount to contributory negligence of the gravity sufficient to bar recovery of damages by him caused by the carelessness of the car's operator. The question is one for the judge or jury in each particular case. There is sound reason for the rule. Nelson v. Nygren, 259 N.Y. 71, 181 N.E. 52; Frank v. Markley, 315 Pa. 257, 173 A. 186.

Of course, it would hardly be held that it is not a serious grade of negligence for a guest passenger to go to sleep in a car operated by one known by him to be intoxicated. In fact, the guest is held to be contributorily negligent from the bare fact that he rides in an automobile when driven by a person known to be under the influence of liquor. The justice of this rule appears beyond debate.

Nathaniel A. Clinton was 38 years old when he died. He was bruised and badly jolted from the impact, but no bones were broken. He was conscious at times, but it does not appear that he suffered greatly. Stimulants were freely administered. He appears to have been a man of considerable business capacity. He owned, or was interested in, a mercantile business, operated farms and a gin. His annual net income was around $3,000. His son was eleven years old when the father died. He was wholly dependent upon him for support, schooling, etc. The father responded liberally to his parental obligation. Between the two the bonds of affection were strong. The child was old enough to grieve and sorrow over the passing of his father and did so.

Plaintiff sues to recover damages on account of the mental anguish and physical pain experienced by the deceased between the time of injury and death, for like anguish suffered by the minor because of the loss of his father; for deprivation of the love, affection and guiding influence of the father; the loss of his support and maintenance and also of his association and companionship.

We think an award of ten thousand dollars ($10,000) adequate in this case, and in line with the jurisprudence wherein cases of like or similar character have been adjudicated.

The physicians', nurses', hospital and funeral expenses incurred on account of the injuries and death of Clinton aggregate $592.

For the reasons herein assigned, the judgment appealed from is reversed, annulled and set aside, and for said reasons there is now judgment in favor of Harry P. Clinton, dative tutor of the minor, Nathaniel A. Clinton, Jr., and for his use and benefit, and against the City of West Monroe, Louisiana, to the extent and in the full sum of ten thousand, five hundred ninety-two and no/100 ($10,592.00) dollars, with legal interest thereon from judicial demand until paid; and for all costs.